PROVOST *v.* BRUECK.

1. TRIAL—CHARGE TO JURY—HOW CONSTRUED.

Where the charge· of the court, taken as a whole, correctly states the law as applicable to the particular case, and clearly defines the issue, the fact that sentences are objectionable when considered independent of the context does not constitute reversible error.

2. LIBEL AND SLANDER—RES GESTÆ—MALICE.

In an action for slander, evidence of an altercation so connected with the utterance of the alleged slanderous words as to form a part of the *res gestæ* is admissible as bearing upon the question of malice.

3. SAME—EVIDENCE.

In an action for slander against a priest for words spoken from the pulpit, testimony of witnesses who were present, to the effect that they understood defendant to mean the plaintiff, because "he referred to a 'barber,' and made a motion with his hand about a razor," was not prejudicial, where the defendant admitted that he used the word "barber" in his talk, and that plaintiff was the only barber in his church.

4. TRIAL—REMARKS OF COUNSEL—HARMLESS ERROR.

The fact that counsel, in offering incompetent testimony, makes improper statements, is not ground for a reversal, where the testimony is promptly excluded, and it appears improbable that the jury were prejudiced by the remarks.

Error to Iosco; Simpson, J. Submitted June 18, 1896. Decided July 8, 1896.

Case by Eugene Provost against Joseph Brueck for slander. From a judgment for plaintiff, defendant brings error. Affirmed.

Plaintiff, in an action of slander, recovered against the defendant a verdict and judgment for $800. The defendant was a Catholic priest at East Tawas, and the plaintiff was a member of his church. The language was uttered

in the pulpit, in the presence of the plaintiff and the congregation.   The declaration alleges:

"That the defendant then and there spoke, published, and declared, of and concerning the plaintiff, the following scandalous, malicious, and defamatory words, to wit: 'That man over there (waving his hand towards plaintiff, and meaning the plaintiff), that caused the disturbance today (meaning that plaintiff had been ordered by defendant to leave his pew in the church when he, said plaintiff, and his family, were peacefully occupying the same, and, on plaintiff's refusal to leave as aforesaid, the defendant had broken and destroyed and cut up the said pew with an ax, and had created much confusion and disturbance thereby, and brought the attention of the congregation and those present to the said defendant and plaintiff and the said pew), he owes me (meaning said plaintiff owed said defendant) for baptizing and the funeral of his bastard (meaning that said plaintiff was the father of a child which had been born out of wedlock, and that he, said plaintiff, owed said defendant for performing the religious ceremony of baptism and the further religious ceremony of burial of said bastard child);' that said words were spoken from the altar of the Catholic church in East Tawas, known as 'St. Joseph's Church,' and in the presence of the congregation of said church, and in a tone and manner loud and plain enough to be distinctly understood by the members of said congregation, and were intended by said defendant to be understood by them.

"'He (meaning plaintiff) thinks he's a pretty big man when he's in the barber shop (meaning the shop of plaintiff), with a razor in his hand.   I (meaning defendant) would not advise people to go there (meaning to plaintiff's shop).   All he (meaning plaintiff) is good for is to cut a man's throat (motioning with defendant's hand across his throat, and meaning that plaintiff would cut men's throats when they went to his shop to be shaved).   I could have him (meaning plaintiff) arrested, and taken to the coop (meaning that defendant could make complaint against plaintiff for some crime, and have him lodged in jail); and he'd have to stay there and rot; nobody would go his bonds (meaning that plaintiff was guilty of some crime, for which defendant could have him imprisoned, and that his character and reputation in the community was such that he was without friends who would be will-

ing to furnish bail for him, and that he could not procure bail, and would have to stay in jail). The French (meaning plaintiff and others of his nationality) are all a low class. They (meaning the French) are a disgrace to the church (meaning the Catholic church of East Tawas). They are rotten bones. He (meaning plaintiff) was a scoundrel and a scandal to the town. He (meaning plaintiff) was a scoundrel before he left here (meaning that plaintiff was a resident of East Tawas, and removed to Au Sable about eight years ago, and afterwards returned to East Tawas), and is one (meaning scoundrel) yet. He (meaning plaintiff) goes around town from one place to another, playing pedro and drinking whisky (meaning that plaintiff was idle and lazy and dissipated, and neglected his business, by frequenting the saloons and gambling places, and that he was not attentive to his business, and could not be found regularly in his shop by his customers).'"

The defendant was entitled to rent the pews in the church. The pew over which the trouble arose had been used by the plaintiff, who, it is claimed, was in arrears. The defendant had leased the pew to other parties. Plaintiff and his family, on the day of the trouble, took the seat. The party to whom it had been rented went to the vestry room of the church, and informed defendant, who thereupon took two axes, or an ax and a hatchet, went to the seat, ordered the plaintiff out, and, upon his refusal to go, commenced to knock the seat to pieces. Returning, he almost immediately entered the pulpit, and, it is claimed, used the language charged. The testimony on the part of the plaintiff is direct and positive that the language above stated in the declaration was used. The defendant's version of the transaction is stated by him as follows:

"On the fourth Sunday of January he was sitting in the pew, and I asked him to get up and go out. He got up, and went a little in front of the pew. When I had ordered him out, I said I would remove the seat. I said: 'That is the only way to get you out. I see you don't obey my orders. You intend to spite me, so that I will remove the seat,' so that he could not have it any more.

That is all that was said. I broke the seat with the hatchet. I came down stairs, and dressed for services, and made an explanation to the people that ' I am sorry and feel really ashamed that such a thing happened in the Catholic church,—such a disturbance, that I was forced to go up and remove the seat. It was a scandal.' Then I had high mass, and preached for high mass, and in the sermon I referred to that affair again, and I said I was sorry that it happened; that I could have him arrested, but I disliked to call in a non-Catholic officer into the Catholic church to keep order, and nobody could bail him out on that day,—Sunday. Then I referred to the fact of the New Year's celebration, and I said that it was a great scandal to non-Catholics especially, the way they spent New Year's night and New Year's day, by going around and scandalizing people by immodest language, and of filling up with bad whisky, and using scandalous conversation; 'and you must not be surprised for that reason, when such things are going on, that there are so many illegitimate children in the community;' that there were two dozen or more; and that the French had given their most generous contingent in the matter of bastardy. I said the French because more cases of the French had occurred than any other nationality. I said it was the French custom to celebrate that way. Then I referred to the opposition that was shown to me for years. I said: 'They are cutting the throats of this community. I know it, for they tried to cut my throat three years ago, when they approached the bishop, on confirmation, to have me removed; and they are trying to do that again.' I said, 'They are cutthroats,—these enemies of mine;' that these people oppose me in all things, and I would never trust the scoundrels again. 'When a man tries to cut my throat once, I would never trust him again, nor would you trust your throat to a barber who was your deadly enemy. You would not.' I said: 'These things that have happened in this parish are a scandal to outsiders, and I am ashamed of it.' I said: 'I have mentioned no names. Judge yourselves who is guilty, and who is innocent. Woe to those who give scandal. I have said my last mass. I am going to see the bishop about it.' I did not speak of Provost when I spoke of bastards. I said there were parties in the community who have forgotten to pay for the baptism and burial of their illegitimate children. I did not speak to

Provost in that connection. I did not, at any time during that statement, point my hand at Provost, but I made gestures, of course."

Other testimony was introduced to corroborate him.

If the jury believed the evidence on the part of the plaintiff, he was entitled to a verdict. If they believed that on the part of the defendant, the verdict should have been, "No cause of action." The issue in this form was very clearly stated to the jury by the court. The court said to the jury:

"If the defendant in this case uttered the language that he says he uttered with the intention that he uttered it, it was no libel against Mr. Provost, or slander either. It would not be anything that Mr. Provost could recover for."

Again, he said to the jury:

"If the defendant, on that morning, although he may have been in a high temper, although he may have felt that the rules of his church had been violated, although he may have gone up there and broken up this pew, and felt sorry for it afterwards, I say if, when he made these utterances, he was directing them towards his congregation generally,—I do not care whether he was wrong in uttering words to his congregation that he even says he uttered,—Mr. Provost could not bring him to account for that. This is a matter of public right that all clergymen have a right to do; that is, to preach to their congregations against wrongs that they think exist."

Other language of similar import was used. The court also instructed the jury that the words upon which the slander was based were slanderous *per se*, and, if they found by a fair preponderance of evidence that such language was used, the plaintiff was entitled to a verdict.

*Charles A. Jahraus* (*M. J. Connine*, of counsel), for appellant.

*Albert E. Sharpe*, for appellee.

GRANT, J. (*after stating the facts*). 1. There are 48 assignments of error, most of which relate to the

charge of the court.   The charge is eminently fair, was a correct statement of the law of slander applicable to the case, and very clearly defined the issue which the jury were to decide.   It will appear from the portions of the charge above given that the judge very emphatically and clearly instructed the jury as to the right of the defendant to attack the immorality which he believed to exist in his congregation, and that for this he could not be held liable, unless such immorality was charged to the plaintiff.   It would be of no benefit to the parties or to the profession to here discuss the rule laid down by the circuit judge, and which has been so frequently discussed and determined by the courts and text writers.   Isolated sentences might be selected which in themselves would be objectionable, but to which no valid objection can be made when they are considered in connection with the entire instruction.   We find no error in the charge of the court.

2. It remains to consider some exceptions to the admissibility of testimony and statements of counsel.   Counsel for plaintiff, in his opening statement, referred to the origin of the trouble, namely, the destruction of the pew, and what then occurred, as the evident cause of the use of the language.   Testimony was also introduced as to what then occurred.   This was received under exception.   It was a part of the *res gestæ*, and was competent as bearing upon the question of malice.

3. Two witnesses were permitted to testify under objection that they understood the defendant, in what he said, to refer to the plaintiff.   These witnesses testified that he looked towards the plaintiff while he was talking, and pointed to him.   One of these said he understood defendant to mean plaintiff, because "he broke the pew he was sitting in; and when he made the motion with his hand about the razor, and about his being a barber, because he was the only barber in the church, I understood that he meant Eugene Provost, the barber." The defendant, in his cross-examination, admitted that

he used the word "barber" in his talk, and that he had no other barber except the plaintiff in his church. In view of these facts, we do not think it was possible for the jury to be misled by the testimony, which might properly have been excluded. This subject was discussed in *Farrand* v. *Aldrich*, 85 Mich. 593.

4. Complaint was made of certain statements made by the counsel for the plaintiff during the progress of the trial. The question was asked the defendant on cross-examination: "Did you have any liquors in your house?" Under objection, this was promptly and properly ruled out as immaterial. Counsel then stated: "He preached against the effect of having whisky in the house, and I want to find out if he had any himself." Again the court ruled that the testimony was incompetent, without even waiting for an objection to be made. Thereupon plaintiff's counsel again stated: "We offer to prove that he keeps large numbers and kinds of liquors in the house, and that he is in the habit of using them himself." Again the court said: "I don't think it could be material." Plaintiff's counsel then stated: "It is where a man preaches against such things, and undertakes to justify himself for attacking the people on that ground." The court promptly said: "I don't see how it would make any damages, or prevent any." Plaintiff's counsel again stated: "It would have something to do with the credibility of his testimony; not if he is honest about it, but goes around the street preaching against it." To these remarks the defendant's counsel objected as prejudicial, and took an exception to them. Counsel should have rested content with the ruling of the court when the question was asked. It was clearly incompetent, and it is impossible to conceive that counsel for the plaintiff did not know it. It deserved severe reprimand from the court. The court properly ruled the testimony out, as wholly immaterial. We think, however, that it would be a reflection upon the intelligence of the jury to say, as a matter of law, that they were prejudiced by

these remarks. Such matters must be left largely to the trial judge, whose duty it is to promptly check such statements when offered, and to instruct the jury that they must pay no attention to them.

The judgment is affirmed.

The other Justices concurred.