WALZ *v.* PENINSULAR FIRE INSURANCE CO.

1. PLEADING—BILL OF PARTICULARS—INSURANCE.

> In an action on a fire insurance policy, where most of the records were destroyed and defendant had been furnished with typewritten sheets of details from which the figures as to the loss had been taken, and defendant had been given ample opportunity to view the premises destroyed, and a thorough examination had been made, the trial court was not in error in denying defendant's motion for a more specific bill of particulars.

2. VENUE—NEWSPAPER REPORTS—ABUSE OF DISCRETION.

> In an action on a fire insurance policy, there was no abuse of discretion by the trial judge in denying defendant's motion for a change of venue on the ground that a fair trial could not be had in said county because of newspaper reports that the insurance companies were back of criminal proceedings in connection with said fire, in an effort to hinder the civil cases, where there was a counter showing by affidavits of residents.

3. INSURANCE—FIRE INSURANCE—EVIDENCE—ADMISSIBILITY.

> In an action on a fire insurance policy, there was no error in receiving testimony as to the activities of a certain person in relation to the cause of the fire, and in permitting him to be characterized as an insurance detective, where the evidence of the character, extent, and evident purpose of his operations fairly supported an inference that he was acting for defendant and the other insurers.

4. TRIAL—VOIR DIRE EXAMINATION—APPEAL AND ERROR.

> In an action on a fire insurance policy denial of defendant's motion for continuance and discharge of the jury because of questions asked a juror by counsel for plaintiff, on the *voir dire* examination, if he had heard of a certain person who had been active in the interest of the insurers in relation to the cause of the fire, who was characterized as dishonest and an ex-convict, and if the

On the question of reference by prosecuting attorney in his argument to the jury, to attempts to tamper with witnesses or jurymen as grounds for reversal, see note in 30 L. R. A. (N. S.) 795.

jurors realized that some of the insurers desired to evade their loss, and that they might secure men whose word might be tainted by the desire to obtain money, *held*, not reversible error, where the question was withdrawn on objection, the court stated that the jury did not consider it anyway, defendant's counsel stated that "we are satisfied with the jury," and it does not appear that defendant's peremptory challenges were exhausted.

5. APPEAL AND ERROR—MISCONDUCT OF COUNSEL MUST BE PROMPTLY OBJECTED TO.

Improper remarks of counsel must be promptly objected and excepted to, and the court requested to instruct the jury to disregard them in order that they may be reviewed, on error.

6. TRIAL—OPENING STATEMENT—CHARGE OF BRIBERY JUSTIFIED BY EVIDENCE.

A statement by plaintiff's counsel in opening that "You gentlemen are going to hear some testimony that I judge will disgrace you, disgrace me, and disgrace every one in the court room in which it is produced, because the facts will show that in this case witnesses have been bribed with money and with whisky and with women," *held*, not reversible error, where there was testimony that a witness had been suborned, and it does not appear that counsel made the statement from improper motives, although too many instruments were named by which the offense was said to have been committed.

7. APPEAL AND ERROR—INADVERTENT STATEMENT NOT MISLEADING NOT REVERSIBLE ERROR.

In an action on a fire insurance policy, where defendant insurer claimed that the owner caused the insured property to be burned, an inadvertent reference to the mortgagee of the property in a statement by the judge in his charge to the jury that "the burden was upon defendant to satisfy them that the owner or the bank (mortgagee) either set fire to this building or caused it to be set on fire," *held*, not reversible error, since the jury could not have been misled thereby.

8. INSURANCE—MICHIGAN STANDARD POLICY NOT VOIDED BY MORTGAGE.

A Michigan standard form insurance policy was not voided because the insured property was mortgaged without consent of the insurer.

9. JUDGMENT—DAMAGES' LIMITED TO AMOUNT STATED IN DECLARA-
  TION.
    The amount of damages recoverable in an action on a
    fire insurance policy is limited to the amount stated in
    the declaration, and plaintiffs are not aided by the *ad
    damnum* clause.

Error to Washtenaw; Sample (George W.), J. Sub-mitted October 27, 1922. (Docket No. 102.) Decided December 29, 1922. Reargued April 26, 1923. Former opinion affirmed June 21, 1923. (223 Mich. 417).

Assumpsit by William L. Walz, trustee, and another against the Peninsular Fire Insurance Company of America on a policy of insurance. Judgment for plaintiffs. Defendant brings error. Modified and affirmed.

*Henry C. Walters* (*Arthur P. Hicks* and *Frank B. De Vine,* of counsel), for appellant.

*Cavanaugh & Burke* (*James O. Murfin,* of counsel), for appellees.

CLARK, J. This action is on a $25,000 fire insurance policy issued to Sarah Goffe by defendant. She owned a plant in Ann Arbor in which, under the name of Ann Arbor Stamping & Metal Company, she was principally engaged in the purchase and sale of sheet metal scrap and in the manufacture therefrom and the sale of small stampings, such as automobile license plates, frying pans, shovels, hoes, spades, etc. A fire occurred in the plant between 11 and 12 o'clock in the night of December 31, 1920. She had ordinary fire insurance amounting to $375,000, and use and occupation insurance to the amount of $30,000. The insurance was written by two agents of the different companies, of which Mrs. Goffe said:

"No, sir; I build up the business, and when the business is built up, Mr. Brooks and Mr. Butler came up and asked me why I didn't take insurance.

"*A.* I told Brooks and Butler' that they should take a look around the shop and see what there is, and they should give me insurance on it.

"*Q.* When did you tell, them that?

"*A.* When I take insurance, when they come to the office.

"*Q.* Every time you took a new policy, you told them that?

"*A.* No, I just told them once, and they take care of me."

There was a fire in the same plant on August 22, 1920, because of which Mrs. Goffe was paid $125,000 by insurance companies. Most of the insurance in question was written after the first fire. This is the first, in point of trial, of, it seems, 58 suits against 46 insurance companies brought to recover the amount of the loss. The plaintiff Ann Arbor Savings Bank, a Michigan corporation, is named in a loss payable clause as payee as its mortgage interest may appear. The policy in the case at bar is dated October 8, 1920. The loss payable clause was attached or indorsed October 27, 1920. On both of these dates the mortgage interest of the bank was $50,150 excluding interest. On December 4, 1920, the bank took another mortgage of $25,000 given by Mrs. Goffe and also signed by her husband, Jacob Goffe. The total mortgage debt at the time of the fire was $75,150 and interest. Mrs. Goffe was also indebted to some 70 creditors whose claims were said to be unsecured, in an aggregate of approximately $265,000, the bank being one of these in the sum of about $91,000.

On January 6, 1921, Mrs. Goffe assigned her rights under the insurance policies to William L. Walz as trustee for herself and her creditors and gave the trustee power to collect insurance and to adjust and pay claims. Sworn proofs of loss were rendered to the companies through public adjusters which claimed of the defendant here the sum of $23,531.30 and stated

the sound value of the insured property and the loss and damage thereto as follows:

|  | Cash Value | Loss or Damage |
|---|---|---|
| Building ................. | $200,000.00 | $68,211.92 |
| Equipment ............... | 164,871.75 | 98,460.50 |
| Stock ................... | 393,082.53 | 393,082.53 |
| Total ................ | $757,954.28 | $559,754.95 |

Prior to the proofs of loss Mrs. Goffe caused to be submitted to the adjusters representing the insurance companies a schedule of sound value and loss and damage. The extent to which such schedule is particularized is indicated by the fact that 17 pages of the record are required to print it. The plaintiffs are the bank and the trustee. The declaration is in usual form, counts on the policy, avers a total loss or damage of "to-wit $350,000" and that there is due the plaintiffs from defendant $25,000 and interest and claims damages in the sum of $25,000. Defendant demanded a bill of particulars. Plaintiffs filed and served a bill setting forth the various aggregates of value and damage and stating:

"The details from which the foregoing figures are taken, comprising a great many typewritten sheets, have already been served upon the defendant company before suit was brought."

There was motion for a more specific bill of particulars. The motion was supported by affidavit and likewise opposed. In disposing of the motion the trial court said:

"And it having appeared from the records in said cause and the argument of counsel upon the hearing of the motion that the records of the equipment and material were mostly, if not entirely, destroyed by fire and therefore not available; and it further appearing from argument of counsel for the plaintiffs and the defendant that details upon which the figures submitted in the bill of particulars filed, were furnished to the

defendant, and that the same comprise many typewritten sheets and that the same was binding on the plaintiffs as a bill of particulars and that the plaintiffs were willing so to be bound; and it further appearing that every courtesy had been extended to the defendant to pass upon the premises which were destroyed by fire, examine and list the condition of the damage by the destruction, and that a very thorough examination had been made.

"The court is, therefore, of the opinion that if the plaintiffs in this cause file, as a part of their bill of particulars, the typewritten sheets presented to the court on the day of the hearing by the respective counsel for the parties, that the same will constitute a complete bill of particulars if the plaintiffs cause to be added to the said typewritten sheets the name or names of the maker or makers of the said equipment, dies, and tools, as is available from memory or otherwise."

The suggestion or order of the court was complied with. The motion for a more specific bill of particulars was renewed. This motion and its supporting affidavit complain of a lack of particulars of raw steel stock. The record shows nearly 8 pages of fine print of such particulars. In deciding this motion the trial court again said:

"This court is advised by the admissions of counsel for the defendant in court upon the argument of the motion that the bills of particulars filed were satisfactory, except as to the steel, and this, it is claimed by the defendant, should be more specifically described. It will appear from the statement attached to the supplementary motion that the defendant has a very complete itemized statement of the steel claimed to be destroyed. This statement furnished to the defendant and made a part of the motion is complete in every detail. It gives the defendant complete knowledge of the dimensions of the steel, number of piles of the steel and the volume and kind of material. The parties may differ as to the volume and price per ton, but that is a question which should be determined by the jury at the time of the trial based upon the testimony. The defendant's counsel did not claim in his argument that

the defendant was in any way surprised or that he could not prepare the case for trial, therefore, it is the conclusion of the court, after careful consideration of the arguments upon the two motions for more specific bills of particulars, and from an examination of the records and files, and the affidavits attached to the motions, that the decision of this court made on the 7th day of November, 1921, should be affirmed, and this motion should be denied, and the same is hereby denied."

With its plea of the general issue defendant gave notice of the following defenses which it says it urged at the trial, quoting from brief of counsel:

"The first defense charged the assignor of the plaintiffs, Sarah Goffe, with falsely, fraudulently, and wilfully over-stating the sound value of the property, and the loss and damage thereto, in her sworn proofs of loss, and alleged the over-statement, in dollars and cents, to be several hundred thousand dollars.

"The second defense charged that the assignor fraudulently and wilfully included in her proofs of loss, stock and fixtures that were not injured or destroyed by the fire.

"The third defense charged the assignor with concealing the fact that stock, dies, materials and fixtures, which she alleged had been destroyed, were saved from destruction, and not injured in the fire.

"The eighth defense charged that the company was not liable for a great quantity of machinery, which was described in this defense, for the reason that it was covered by a chattel mortgage, at the time of the fire, without any agreement that the company should be liable for loss on property so incumbered.

"The ninth defense, being one of the five defenses relied on, charged that Sarah Goffe, assignor, and her husband, Jacob Goffe, procured the fire to be set, and the property to be damaged and destroyed, for the purpose and with the intent to defraud the defendant."

Jacob Goffe, Jack Sands and Jack Isaacs were arrested and charged with burning the property in an attempt to defraud the insurance companies. An examination was had. They were held to the circuit

court for trial.   After some delay, on motion of the
defense and by consent of the prosecution, an order
*nolle prosequi* was entered as to all defendants.
These criminal proceedings in their various incidents
were attended by the usual reports in the newspapers
of the city in part to the effect that it had been said
that the insurance companies were back of the prose-
cution in an effort to hinder the civil cases, that the
companies were hard pressed for evidence, that bribery
had been charged, etc.   Defendant moved to change
the venue, supporting such motion by copies of the
press reports of the criminal proceedings, a list of
stockholders of plaintiff bank, chiefly residents of the
city, and affidavits of counsel and others asserting that
a fair trial could not be had in the county.   There was
a counter showing by affidavits of residents of the city.
The motion was denied.   From time to time through-
out the trial at the suggestion of counsel on both sides
the number of spectators in attendance at the trial
was noted in the record.   The average daily attend-
ance of the observations made was nine.

Mrs. Goffe was illiterate.   The bookkeeping was
primitive.   Her daughter did most of it.   Her hus-
band was manager.   Fred O'Connor was superintend-
ent.   Bartz was an employee.   In a few years the
business had grown from a small annual volume to
better than half a million in 1920.   It is said that the
business was profitable, though it is also said that
there was in 1920 a decided slump in the value of the
steel stock which was the big item in the case.   Mrs.
Goffe testified of limited knowledge of and participa-
tion in the affairs and management of the business.
The proofs of loss were prepared by Mr. Campbell,
an adjuster for the insured, aided by O'Connor and
Bartz.   Mrs. Goffe testified:

"I said to Mr. O'Connor:   Mr. Campbell called and
asked of me: 'We have got to have proof of loss,

what was lost in the fire.' He says: 'I can do that for you. I will go to the shop and we will figure up what is there and what is gone, and we will take a record of that.' Then the next day he came up and gave me a slip of paper. I don't know as it was the next day, but he had everything correct on a slip of paper. And I said: 'Fred, is that the proof of loss?' And he said: 'Yes.' I handed that slip of paper to Mr. Campbell. I can't remember how many sheets of paper there were; a handful, I don't know, probably 2 or 3, I can't remember, there may be 4 or 5; I can't remember. Ask Fred O'Connor, he will tell you. I can't read so I cannot tell whether this is the paper that was handed to me or not. Mr. O'Connor could tell the figures. I believe that is the paper that Fred O'Connor handed to me. I can't tell whether all those sheets were there when it was handed to me, or not? It was a handful. I couldn't remember. He gave me all the loss there was on a slip of paper. * * *

"I saw the proofs of claim that were presented to the insurance company in this matter. I could not go over those proofs of loss on the various items—steel, machinery, and dies—because I could not write, but I was there and Mr. Campbell and Mr. O'Connor and Mr. Bartz; O'Connor made a statement and took us over the shop and showed us everything that was destroyed or damaged in the fire, and Mr. Campbell checked it off. Then I took that statement that Mr. O'Connor gave, to Detroit."

Mrs. Goffe denied that she had been guilty of fraud in connection with making proof of loss.

Pertinent to defendant's claim of fraud in the making of proof of loss there are hundreds of pages of testimony relating to the long list of items in the schedules. Space forbids a review of such testimony. An issue of fact upon the matter was made by the conflicting evidence adduced.

Mrs. Goffe denied knowledge of the cause of the fire and any wrongdoing in connection therewith, and she denied having given any improper instructions to her employees respecting the making of proof of loss

and that there was fraud or wrong in connection therewith. In this she has support in the record, and it appears that in the early stages of this matter she was supported by O'Connor and Bartz. But before the trial and nearly a year after the fire O'Connor and Bartz and one or two others suffered a decided change as to the facts in the case. Defendant seems to contend that these persons turned from aiding and abetting in crime, and in the effort to defraud the insurance companies, into the way of truth. Plaintiffs contend that these persons were corrupted. This difference in contention has produced questions necessitating a further statement of facts.

At the trial Bartz testified at length of gross fraud in many particulars in the making of the proof of loss. When confronted with schedules of value, loss and damage written by him, he stated they were false and that he had so prepared them at the request of Mrs. Goffe or her husband. He at first refused to deny having made statements subsequent to such schedules to the effect that the claim for the insurance would not cover the loss, but later he denied making such statements. There was testimony that he had made statements of that import. Bartz also testified that Mrs. Goffe owed him about $2,400 and that she did not pay him, that he knew one Friedman on whom he and O'Connor, who also claimed Mrs. Goffe owed him about $1,700, called about a year after the fire, of which:

"*Q.* You told Dave Friedman that if Sarah Goffe wasn't going to pay what you claimed, that you were going to get some money from the insurance companies?

"*A.* I didn't say anything of the kind.

"*Q.* And asked him to have him put you in touch with the insurance people, didn't you?

"*A.* That is all.

"*Q.* Well, you told him that you had something that

you would sell to the insurance company if Dave would put you in touch with the insurance companies?

"A. I never said anything of the kind.

"Q. In the presence of Dave Friedman and his wife in his home about Christmas time, this past Christmas?

"A. I did not say anything about 'sell.'

"Q. What did you say about wanting to get in touch with the insurance people?

"A. I told him I would like to get in touch with them. I didn't exactly do it myself. O'Connor said it at first. He said, 'I will get in touch with them.' Friedman said: 'How much do you think that ought to be worth?' I said, 'We don't want any money.'

"Q. What did you say that you thought it ought to be worth?

"A. I said we didn't want any money.

"Q. What did O'Connor say in your presence about the money?

"A. He did not say a word to him.

"Q. What did Friedman say about the insurance money?

"A. Friedman said he was going down to see them.

"Q. Friedman said he was going down to see them?

"A. Yes; he said he was going to get about $28,000 for the case if we would tell what was right.

"Q. Friedman promised you and O'Connor $28,000?

"A. Yes.

"Q. If you would tell them what was right?

"A. If we would tell them, and we didn't do it.

"Q. Why didn't you tell Friedman what was right?

"A. No, sir, I did not.

"Q. Who have you told what was right?

"A. We got in touch with somebody else.

"Q. Who was that?

"A. That was—

"Q. That was a gentleman named Feilschmidt?

"A. Yes.

"Q. Now, Feilschmidt is an insurance detective, isn't he?

"A. No, sir, he is not.

"Q. What is he?

"A. He is an investigator for the underwriters."

Bartz also testified:

"*Q.* Did you ever make any remark to Mr. Walz, one of the plaintiffs in this case, sitting right here, about what you would do to Sarah and Jacob Goffe if they did not come through with some money? Did you?

"*A.* I said that I would kick it over. That is all I did tell them. * * *

"*Q.* You also told him that if she did not come through, you would go the limit with her, didn't you? You used the term, 'Go the limit.'

"*A.* Yes."

The witness also said that Mr. Goffe stated in substance that he had procured Sands and Isaacs to set the fire. O'Connor also testified at length of gross fraud and falsity in the schedules and proofs of loss and that his part in making them had been at the instance of Mr. Goffe. He admitted having called on Friedman with Bartz and having asked to be put in touch with the insurance investigators, but denied Bartz's statements respecting the $28,000. He met Feilschmidt and one Lehman. They questioned him of the fire but he made to them no such statements as he made at the trial. Nor did he when questioned by the deputy attorney general. He testified:

"*A.* I told them I was going to kick it over.

"*Q.* You told them you were going to kick it over?

"*A.* Yes, sir.

"*Q.* Unless you get some money?

"*A.* Yes, I wanted my money."

He got in touch with Feilschmidt through Lehman. The witness, when interrogated respecting his conduct and statements during a considerable period after the fire and relative to his testimony on the criminal examination, asserted that though his early statements and conduct were in the main false and fraudulent his testimony at the trial was true. Mrs. Seifert, a domestic in the Goffe home, testified that soon after the fire she overheard a conversation between Mr. and Mrs. Goffe to the effect that they had procured the fire

to be set.   But this witness made on oath in April, 1921, a purported recital of facts in which there is no such statement, the recital being of contrary tenor. After meeting Feilschmidt she signed another affidavit. She also claimed that a sum of money was due her from Mrs. Goffe.   The witness Kuebler, a watchman at the plant, testified of having heard pounding in the plant on the night in question.   But on cross-examination he said:

"*Q.* You know Dave Friedman?

"*A.* Yes.

"*Q.* And Dave took you to Chicago, didn't he?

"*A.* Yes.

"*Q.* Dave paid for your ticket to Chicago?

"*A.* Yes.

"*Q.* And he bought you a nice suit of clothes, didn't he?

"*A.* Well, my wife buy them.

"*Q.* Well, he gave your wife some money to buy her a dress and you a suit of clothes, didn't he?

"*A.* Yes.

"*Q.* And after Friedman had given your wife a dress and some money, and you a suit of clothes, he took you to Chicago.   Who did you see in Chicago?

"*A.* The insurance fellow from Chicago.

"*Q.* What?

"*A.* The insurance fellow from Chicago.

"*Q.* The insurance expert in Chicago?

"*A.* Yes.

"*Q.* What was the name of this insurance expert in Chicago that you saw?

"*A.* I no know what his name.   Mr. Friedman took me over.

"*Q.* It was your old friend Feilschmidt, wasn't it?

"*A.* Feilschmidt, yes.

"*Q.* So after you told Mr. Cavanaugh you knew nothing about the fire, and told Walz whatever you told him, and after your wife had some money and a dress and you a suit of clothes, and you had gone to Chicago at Friedman's expense, you met Feilschmidt, didn't you?

"*A.* Yes, I met Feilschmidt.

"*Q.* And then you began to hear pounding on the pipes?

"*A.* Yes.

"*Q.* You began to hear sledge hammers in the building, didn't you?

"*A.* Yes.

"*Q.* And you began to see a fire on the floor of the living room, didn't you?

"*A.* Yes.

"*Q.* As a matter of fact, they put you up in a nice hotel there, didn't they?

"*A.* Yes."

There seem to be marked differences in the testimony of this witness in the criminal case and in the case at bar. Mrs. Kuebler explained that her husband was paid $20 that he might be better dressed for the trip to Chicago. She denied getting a dress.

There was testimony that Feilschmidt was an insurance detective, that he had been seen coming out of the office of the Underwriters' Adjustment Company, "That is the group of insurance companies defending these law suits," and that he had talked with other probable witnesses in the case.

Defendant's theory of the fire seems to be that the Goffes procured Sands and Isaacs to set it. In support of this counsel for defendant have fully discussed the evidence and have pointed out significant and suspicious circumstances. There is testimony which if believed might establish an alibi for Sands and Isaacs. And plaintiffs' counsel have also reviewed such evidence, direct and circumstantial. All of which indicates an issue of fact for the jury. The jury viewed the premises. Plaintiffs had verdict and judgment for $25,001.30. Defendant has 161 assignments of error, which have been grouped under convenient heads.

1. We agree with the trial court, for the reasons stated by him above quoted, in his refusal to require a more particular bill of particulars. See *Wright* v.

*Dickinson,* 67 Mich. 580 (11 Am. St. Rep. 602);
*Hamilton* v. *Ingham Circuit Judge,* 84 Mich. 393.
And upon this record it cannot be said that there was
an abuse of discretion in refusing to change the venue.

2. It is said that there was error in receiving testimony of Feilschmidt's activities in the case, in permitting him to be characterized in comment and testimony as an insurance detective and in allowing inference and argument that he had acted for the
Underwriters' Adjustment Company, the group of insurance companies defending the cases, of which defendant was one. No one urges that Feilschmidt was
engaged in a worthy effort to uncover truth. Defendant disclaims him. Plaintiffs assert that he
corrupted and suborned witnesses. He, Lehman and
Friedman were not called as witnesses. His activities seem to have related to and to have covered the
cause of the fire. He was seen coming from the office
of said Underwriters' Adjustment Company. This,
with the character, extent and evident purpose of his
operations fairly support an inference that he was
acting for and in behalf of the defendant and the
other insurers. In this regard we find no error.

3. In examining a juror on the *voir dire,* counsel
for plaintiffs asked if he had heard of Feilschmidt, an
insurance detective. This was followed by questioning
respecting prejudice because of Feilschmidt's activities, etc. He was characterized as dishonest and an
ex-convict. This question was asked and upon objection withdrawn:

"You realize in a case of this kind, where some of
these companies in which this insurance was placed,
where some of these companies desired to evade their
loss and to avoid payment of this claim, you realize the
fact, do you not, that they may secure men whose word
may be tainted by their desire to obtain money?"

Defendant sought continuance and discharge of the
jurors because of such examination. The court said:

"I think the question has been withdrawn, and the jury did not consider it any way.    The motion is denied."

The examination as continued shows further questioning respecting Feilschmidt.    Exceptions were had. We find no proof that he was an ex-convict.    Counsel were too eager to parade Feilschmidt and his doings. But in view of the withdrawal of the most offensive question, the statement of court, the evidence adduced above reviewed, the statement of counsel for defendant that "we are satisfied with the jury," and that it does not appear that peremptory challenges of defendant were exhausted, we decline to hold the matter to be reversible error.    *Snyder* v. *Mathison*, 196 Mich. 378, at page 386; *Roach & Co.* v. *Blair*, 190 Mich. 11; *Church* v. *Stoldt*, 215 Mich. 469; *Link* v. *Fahey*, 200 Mich. 308; *Webster* v. *Stewart*, 210 Mich. 13.

4. It is claimed that there was misconduct of counsel in making improper remarks and comments throughout the trial.    While exceptions were noted to several of such remarks and comments and the court in some instances struck out the objectionable matter and said that the jury would not consider it, we find no request that the jury be instructed to disregard such remarks and no request to charge upon the subject.    Of a like situation it was said in *Kirchner* v. *Railway*, 91 Mich. 400:

"There would be great force in this contention had counsel for defendant on the trial called the attention of the court to the effect which the remarks of plaintiff's counsel were intended to have upon the jury, and asked that the jury be cautioned against receiving such remarks to influence their verdict, or had counsel for defendant asked an instruction to the jury upon that subject before or at the time of the giving of the charge."

And in 12 Cyc. p. 819:

"Improper remarks of counsel must be promptly ob-

jected and excepted to, and the court requested to instruct the jury to disregard them in order that they may be reviewed on appeal."

And see *People* v. *Maczulski*, 194 Mich. 193; *Spencer* v. *Johnson*, 185 Mich. 85; *People* v. *Sartori*, 168 Mich. 308; *Eberts* v. *Mt. Clemens Sugar Co.*, 182 Mich. 449. Of course if exceptions were taken to remarks which were of such character that they could not be cured by instruction, the rule would be otherwise. See *People* v. *Osborn*, 205 Mich. 531, and cases cited. But we find, as presented here, no remarks or comment of counsel of that character. For cases involving similar conduct of counsel, see *Provost* v. *Brueck*, 110 Mich. 136; *DeLong* v. *Booming Co.*, 88 Mich. 282; *Daniels* v. *Weeks*, 90 Mich. 190; *O'Dell* v. *Straith*, 208 Mich. 497; *Gagush* v. *Hoeft*, 208 Mich. 147. We think defendant was not prejudiced by the remarks. The trial court was of that opinion, and defendant's counsel in one instance said, "I do not think you are succeeding very much in prejudicing the defendant." And of the purpose of a remark again said: "The court knows and the jury knows." And as we have often said jurors must be credited with intelligence. Misconduct of counsel is often more harmful to his client than to the opposite party. And as was said in *Daniels* v. *Weeks, supra*, "We are satisfied that the jury would have rendered a verdict for the plaintiff had these remarks not been made."

5. Plaintiffs' counsel said in opening:

"* * * then you gentlemen are going to hear some testimony that I judge will disgrace you, disgrace me, and disgrace every one in the court room in which it is produced, because the facts will show that in this case witnesses have been bribed with money and with whisky and with women."

There was testimony to support a charge that a witness had been suborned. And there is precedent for

referring to such misconduct as "bribery." *People* v. *Salsbury,* 134 Mich. 537.   Commonly it is so characterized.   9 C. J. p. 406.   There being testimony to sustain the gist of the statement, and it not appearing that counsel made the statement from improper motives, that too many instruments were named by which the offense was said to have been committed does not here constitute reversible error.   See *Prentis* v. *Bates,* 93 Mich. 234 (17 L. R. A. 494) ; *Porter* v. *Throop,* 47 Mich. 313.

6. Error is assigned upon remarks of the judge made in an effort to expedite the business of the court.   The remarks do not constitute reversible error.

7. The verdict is not against the great weight of the evidence.

8. The judge in his charge said:

"* * * the burden is upon the defendant to satisfy you by a fair preponderance of the evidence that Sarah Goffe or the Ann Arbor Savings Bank either set fire to this building or caused it to be set on fire."

This reference to the bank was clearly inadvertent and could not have misled the jury.   We find in the charge and in the refusal of requests nothing which warrants reversal.

9. It is urged that the policy in question, Michigan standard form, was voided by the mortgage of December 4th, above stated, that it was given without the consent of the insurer, and that it was a change in title and interest of the subject of insurance.   This is disposed of by *Lindemann* v. *Insurance Co.,* 217 Mich. 698, and other cases of like holding.

We come to the last question to be discussed.   All questions not discussed have been considered.

10. The verdict is said to be excessive.   We think it is in one particular.   The trial court fixed the maximum amount of plaintiffs' recovery under the evidence

at $23,531.30 and interest from February 26, 1921, at 5% per annum. The verdict was rendered June 2, 1922, in the sum of $25,001.30. The interest allowed to plaintiffs was, it seems, $1,470, roughly 5% on the said maximum for the time. It is apparent that the jury computed interest for the time, 1 yr. 3 mo. 6 days, roughly at 5% per annum as the judge several times instructed them to do, although in the introductory part of his charge he stated that plaintiffs had consented that the interest be computed at 6% flat instead of at 5% per annum for the time. The damages were stated in the declaration to be $350,000 or 93 1/3% of the total amount of fire insurance. So as to this defendant the declaration must be held to have stated damages in the sum of 93 1/3% of $25,000 or the sum of $23,333.33. And, although plaintiffs, under the evidence, might have been entitled to a maximum of $23,531.30 and interest, because of the declaration they were limited to $23,333.33 and interest. Nor are plaintiffs aided by the *ad damnum* clause. See *Abernethy* v. *Township of Van Buren*, 52 Mich. 383; 2 Abbott Cyclopedia Michigan Practice (2d Ed.), p. 1394; 13 Cyc. p. 181. No amendment was sought or made. The maximum of verdict including interest under the declaration is the sum of $24,733.24. The judgment will be affirmed in that amount and plaintiffs will remit the excess. See *Kenyon* v. *Woodward*, 16 Mich. 325. This discrepancy it seems was not called to the attention of the trial court. And as it does not appear to have been pointed out on the motion for a new trial defendant may not have costs. Plaintiffs will recover costs in this court.

FELLOWS, C. J., and WIEST, MCDONALD, BIRD, SHARPE, and STEERE, JJ., concurred. MOORE, J., did not sit.