MELLINGER v. PRUDENTIAL INSURANCE COMPANY
OF AMERICA.

1. INSURANCE—TOTAL DISABILITY—EVIDENCE.

In insured's action under disability provisions of life insurance policy in stock company, evidence, including expert and lay testimony, presented a question of fact for the jury as to whether or not plaintiff became totally and permanently disabled for about nine months before reaching the age of 60 years and supported verdict for defendant in such respect.

2. APPEAL AND ERROR—VERDICTS—EVIDENCE.

The Supreme Court will not set aside a jury's verdict, supported by competent evidence, even if it might be in doubt as to the ultimate facts.

3. INSURANCE—TOTAL DISABILITY—INSTRUCTIONS.

Instruction to jury in action by insured under disability provisions of life insurance policy in stock company, *held*, to have fairly presented issues to jury as to whether plaintiff was totally and permanently disabled for some nine months before reaching the age of 60 years and whether he was so disabled after reaching such age as to exempt him from payment of further premiums and return of premiums paid after reaching such age.

4. SAME—TOTAL DISABILITY—PARTIAL DISABILITY—INSTRUCTIONS.

Where insured was not entitled to recover under disability provisions of life insurance policy when he was only partially disabled prior to reaching the age of 60 years, it was proper for trial judge to instruct jury to distinguish between total and partial disability.

5. SAME—JURY—CHALLENGE FOR CAUSE—PEREMPTORY CHALLENGES.

In action against stock life insurance company to recover disability benefits, question as to whether or not error was committed

REFERENCES FOR POINTS IN HEADNOTES
[2] 3 Am. Jur., Appeal and Error, §§ 887–889.
[5] 31 Am. Jur., Jury, § 172.
[6] 3 Am. Jur., Appeal and Error, § 1050.

in failing to excuse five jurors for cause because they held non-assessable policies in defendant company is not determined, where it is not shown what the provisions in the policies were with respect to dividends, and judge carefully interrogated jurors and determined their interests were too remote.

6. JURY—CHALLENGES FOR CAUSE—PEREMPTORY CHALLENGES.

A party cannot complain of error in the overruling of a challenge for cause if it does not force him to exhaust his peremptory challenges.

7. INSURANCE—TOTAL DISABILITY—PREMIUMS—INSTRUCTIONS—VERDICTS—EVIDENCE.

Jury's verdict for premiums paid by insured after reaching the age of 60 years, rendered in action by insured to recover disability benefits under life insurance policy for nine months disability previous to reaching such age, is not disturbed as a compromise verdict, where instructions given clearly defined the issues although not couched in the language submitted in insured's requests to charge, case has been twice tried before a jury with verdict in favor of insurer, insured was in no way restricted in his proofs and credible and substantial testimony supported insurer's claims.

Appeal from Oakland; Hartrick (George B.), J. Submitted October 14, 1948. (Docket No. 58, Calendar No. 44,200.) Decided November 12, 1948. Rehearing denied December 17, 1948.

Assumpsit by Frank H. Mellinger against Prudential Insurance Company of America, a New Jersey corporation, for money claimed to be due under total and permanent disability clause of life insurance policy. From verdict and judgment for plaintiff in an alleged insufficient amount, he appeals. Affirmed.

*Edwin J. Mercer,* for plaintiff.

*Dickinson, Wright, Davis, McKean & Cudlip* (*Max L. Veech* and *Daniel J. Tindall, Jr.,* of counsel), for defendant.

Butzel, J.   Frank H. Mellinger, plaintiff, who
became 60 years of age on December 5, 1946, was
stricken with infantile paralysis when 5 or 6 years
of age. He recovered in a year but according to his
testimony the disease left his "left leg withered,
especially below the knee, and also the foot." He,
however, engaged in a large amount of exercise,
learned to swim, climb a rope, work on parallel bars
and participated in calisthenics and in various ac-
tivities in the gymnasium; he could not play basket-
ball and did very little running. As he matured, he
was able to compensate for his disability and he tes-
tified that he was able to walk so that he could keep
up with a normal person's walking. He, however,
testified that he could not stand on his left leg and
balance himself; that there were no muscles in the
left foot or below the knee; that the left leg and foot
might be compared to a stick with all the weight on
an area of about the size of a half dollar. While he
could not balance himself on the left leg in walking,
he found with a fair amount of momentum he could
keep his balance. As a lad while going to high
school, he ran an elevator, later took a position in a
ticket office for two years, and then went to New York
University where he took a course in business admin-
istration for three years, and subsequently he worked
for large accounting firms. In 1915 he came to De-
troit where he started his own business, first renting
desk space in another office. His business was that
of property management, which he operated under
the name of Mellinger Management Company. He
succeeded in building up a large clientele, and from
1922 to 1935 he had as many as 70 to 80 buildings to
look after. He would give them a thorough inspec
tion once a month and then he would go to them from
day to day as matters arose requiring his attention.
The majority of the buildings were apartments. The
larger number of the buildings were four stories or

less in height and did not have elevators.  He inspected the basements including the boiler and locker rooms.  He would make a thorough check of the buildings from top to bottom.  He claims that he also would make 12 to 15 calls a day on prospective clients but would not see them all.  The record does not show with any degree of certainty how extensive his business activities were from 1935 to 1942.

In 1922 he took out a $25,000 life insurance policy, and in 1924 an additional policy of like amount with the Prudential Insurance Company, defendant and appellee herein.  The policies were later revised on payment of additional premiums so as to provide that if the insured became totally disabled, either physically or mentally, from any cause whatsoever, to such an extent that he was rendered wholly, continuously and permanently unable to engage in any occupation or perform any work of any kind of financial value prior to his reaching the age of 60, he should be released from all further premiums, and also should receive each month during the balance of his lifetime 1 per cent. of the face value of the policies.  This would aggregate $500 a month.  It further provided that if such disability occurs after he reached the age of 60, he should be exempted from paying any further annual premiums.

He claims that on March 1, 1946, slightly more than 9 months prior to his reaching the age of 60, he became and was totally and permanently disabled because of the complete atrophy of the weakened left leg to support him adequately and safely in his movements and by reason of exhaustion and peril to his health in the normal activities necessary in the prosecution of his vocation or business in which he is or was then fitted to engage.  Defendant denied his claim and plaintiff brought suit on December 30, 1946, asking for a judgment for $500 for each month since the date in which he claims he became totally

and permanently disabled, and also interest on such sums, also for the recovery of the amounts he had paid for premiums on the policies plus interest from and after the date on which he claims he became totally disabled.

The case was tried twice before a jury which rendered a verdict for defendant. In the trial of the instant case, the jury, however, allowed the recovery of $1,909.09 for premiums paid by plaintiff after he reached the age of 60 years obviously on a finding that he became totally and permanently disabled only after he reached the age of 60. Plaintiff appeals.

In his brief plaintiff sets forth a large number of questions involved and all of them have received our consideration. The main claim stressed by him is that the verdict was against the great weight of the evidence. In order to properly discuss this question, we must briefly review some of the salient facts. Plaintiff testified that in conducting a property management business in the usual, customary and essential way, a part of the activities is outside of his office. This testimony was corroborated by Mr. Bassett of the Detroit Trust Company in charge of its property management department. Mr. Bassett, however, stated that large management companies have inspectors who do the outside work; in some cases they employ men who do both outside and inside work. They also have solicitors who do the soliciting in some cases. It is possible for someone else to do part of that work but generally management work is obtained through the contacts established through the heads of the firms; that as the business becomes older it requires much less effort to secure new business. Plaintiff showed that at one time he employed outside men and a large clerical force, but lately he had run the business largely by himself with the assistance of one stenographer.

He testified that in the 2 months preceding February, 1943, he had 6 falls; that in the next two years he had 15 falls; that in most of these cases he caught himself with his hands and arms, but that the physical result of the falls was sore shoulders which in spite of medical treatment are still sore to some extent, causing him to lose sleep and preventing him from engaging in all the activities he normally would. Many of the falls were in winter in slippery weather. He claims that he gradually was obliged to cut down on his activities and in 1944, he stopped all outside work except such as was absolutely necessary. In April, 1945, he states that because of his physical condition he decided to dispose of his business and finally consummated an arrangement with one Theodore W. Ryan, who took over the business on March 1, 1946, the date on which plaintiff claims he became totally and permanently disabled. Plaintiff claims that thereupon he retired from all active participation and has not inspected any properties or solicited any business. During the first several months after the arrangement he called at Ryan's office on an average of 3 or 4 times a month, but during the following year or so he has only called once or twice a month. He claims he gave up all activities in connection with the business because of the distress and pain he suffered when he was on his feet and because he was no longer able to continue the business as it should be conducted. He did a small amount of casualty and fire insurance business for properties that he managed, but this took a negligible amount of his time and is not to be considered. Mr. Ryan did not want to bother with the insurance business. It only required in all about one day a year of plaintiff's time.

On cross-examination of plaintiff, the following facts were brought out. Under the contract with Mr. Ryan he had a right to inspect the books of

Mellinger Management Company at any time during business hours. The business was conducted by Mr. Ryan as the Mellinger Management Company and the location of the office was changed. Mr. Ryan sent out notices to parties with whom plaintiff had been doing business stating the Mellinger Management Company was moving to a new location and giving the new address and new telephone number. It bore the printed signature of "Mellinger Management Company, Frank H. Mellinger and Theodore W. Ryan." Under the contract with Mr. Ryan, plaintiff was to be informed in regard to any complaints filed by tenants, furnished with copies of any correspondence in connection with owners' complaints, and he had a right at any time on 30 days' notice to take back the business on the payment of a nominal sum. The arrangement was to be continued for 20 years during which Mr. Ryan and Mr. Mellinger were to divide the gross proceeds from the business.

A former stenographer for plaintiff testified that she worked for him in 1929 when he had 4 or 5 clerical employees in the office, and when she returned to work for him in 1944, there were no clerical employees in the office. She went to Mr. Ryan's office after the arrangements were made with him by plaintiff. She claims that on returning to work for plaintiff in 1944, he showed signs of fatigue and particularly of excessive perspiration. One day he stated that he felt dizzy and went into his private office where he remained for a while. The name Mellinger Management Company was added to other names on the door of the office to which the business had been moved, when Mr. Ryan became interested. Plaintiff testified that he eased off in driving from 1942 to and including 1945; that he was using the train to a great extent or almost entirely. Plaintiff's home was in Birmingham and a commuters' train to De-

troit stopped there.   Defendant claims that this tes-
timony was given by plaintiff to indicate that plain-
tiff ceased using his car for physical reasons.   On
cross-examination, plaintiff, however, admitted that
during the major portion of these years gasoline ra-
tioning was in effect, and ordinarily it would have
been impossible for plaintiff to make more than a
few automobile trips from Birmingham to Detroit in
a month.   Plaintiff further testified that in 1942, he
also began easing off on his outside work and in
1943, he stopped it almost entirely.   On cross-exam-
ination he testified that during such period, he was
inspecting his properties on an average of once a
month, but occasionally he would go to the buildings
for various reasons.   He further stated that from
1942 to March 1, 1946, his footing was unstable and
he had pain and tired quickly "after being on his
feet" a short time.   On the other hand, it developed
from his testimony that he was playing golf contin-
uously during part of this time and that he never
had a fall on the golf course.

A very damaging written statement refuting some
of his testimony was made by plaintiff in filling out
a questionnaire sent to him by defendant.   Plaintiff
signed it on October 5, 1944.   In it he stated that he
worked 8 hours on weekdays, sitting and walking,
that he never felt any strain from overwork, that he
walked several miles a day; he slept $7\frac{1}{2}$ hours at night
and was frequently disturbed once during the night.
He stated that he perspired easily and freely, drank
plenty of water.   He took no drugs except some tab-
lets occasionally when restless to assist him in sleep-
ing, but he would not take more than 1 or 2 a month.
He further stated that he was not subject to an habit-
ual tired feeling, et cetera.   He did state that he had
some shortness of breath after slight exertion.   In
answer to a question regarding his sight and hear-
ing, pains, discomfiture or sickness, including dizzi-

ness, and other sicknesses, his answer was that he wore glasses, had his eyes re-examined during the past month, and that he goes to the dentist twice a year. He mentioned nothing else.

Plaintiff further testified that in management of apartments, the caretaker was the key man of the building as far as the work at the building was concerned, that the caretaker kept the building clean and attractive and did the minor plumbing and electrical repairs; that if there was some major job to be done, the caretaker would telephone plaintiff who would have some contractor do the job.

Plaintiff testified he played 18 holes of golf at a time and in response to the question as to whether he noticed a change in his ability to play, he stated that in the spring of 1945, he began skipping holes. He testified that in 1944, he had a pain in his chest but no serious claim is made in regard to that. On direct examination he testified that in 1941 he discontinued the playing of golf during July and August as the hard ground during those months caused his left foot and leg and the ball of his right foot to become sore.

The medical testimony was at variance. Plaintiff testified that 7 doctors had treated him from 1938 to 1945, 1 of whom had died and 2 were called as witnesses. Four of them were not called. The first witness whom plaintiff did call was a doctor of osteopathy who treated him on May 5, 1943, and in November, 1944, and not again until after appellant reached the age of 60. The cause of plaintiff's difficulty was a pain in the back and right shoulder alleged to have been caused by falls. The doctor testified that plaintiff could walk from one-half to one mile a day; that he could walk up and down stairs as long as it was not happening constantly every day; that a reasonable amount of exercise was beneficial. He further testified that as a person

progressed in age, he lost his muscle tone. Another orthopedic surgeon only examined appellant once and that was for the purpose of testifying at the trial. He found that there had been very little change in appellant's left leg for several years prior to the date of his examination. His testimony did not show what physical activity the doctor would disapprove of. Another medical witness was an internist of large experience. He gave appellant a complete physical examination May 6, 1945, because appellant was worrying about his heart. He found the heart to be normal and the circulation in the left leg reasonably satisfactory. Plaintiff complained of unsteadiness and the physician advised that he see a neurologist and orthopedist. He also saw appellant on December 2, 1946, a few days prior to his sixtieth birthday and thought that the foot looked somewhat worse, that the circulation had begun to deteriorate. He advised appellant to slow up and not do so much walking and stair climbing. He thought that the symptoms were the natural result to be expected in a man of appellant's physique when taking into consideration his disability and his age. He found that appellant was certainly handicapped in every move that he made on his feet, that he should do almost nothing in the way of walking. He found appellant otherwise to be normal in almost every respect for his age.

Defendant, however, produced physicians of high standing. One doctor, a well-known internist, whose qualifications also were the highest, examined appellant on August 12, 1946. He found no reason why appellant could not walk without impairing his health, although it was not as easy for him as for a normal person. He stated that walking up and down stairs would not impair his health, nor would it do him any harm to walk leisurely nor did he think there was any limit to the distance except when nat-

ural fatigue set in. He examined appellant again shortly before the trial and found that, if anything, appellant's condition had improved as he had reduced his weight from 200½ to 185 pounds. He found no change during the interval of time he had seen him last.

Another doctor of experience examined appellant October 15, 1946. He found no inability for plaintiff to perform normal coordination and synchronistic movements. He said there was considerable atrophy, muscle wasting, in the left thigh and lower leg and the left ankle was very weak.

Another physician of high standing also made a neurological examination and found conditions quite normal except for the weakness of the leg. An orthopedic surgeon also of the highest qualifications examined plaintiff in August, 1946, and again on February 14, 1948. He stated that on the first examination he found plaintiff's muscle control in the left knee and leg above the knee were fairly close to normal, that the poliomyelitis resulted in only a very slight impairment of muscles that controlled stability in walking; he found no deterioration in the foot because of lack of circulation nor any other evidence of instability. He testified that appellant's type of incapacity could be properly controlled by proper appliances, with the use of which there was nothing to indicate that appellant would have pain in normal walking or stair climbing; that fatigue might develop after a half hour of walking; that climbing three flights of stairs might be uncomfortably fatiguing. He also thought that the fact that appellant had been able to play golf during the years 1942 to 1945, and had never had a fall on the golf course evidenced that his physical capacity was such that he could pursue ordinary activities. On cross-examination he stated that his notes, dictated August 9, 1946, showed that from plaintiff's statements instability

appeared slightly about 10 years ago, and markedly so about 5 years ago, with progressive frequent falling, and that there is a "floppy" condition of the ankle. The testimony, however, of this physician in the main was very unfavorable to plaintiff.

There was some testimony in the case showing deterioration in plaintiff's condition after he reached the age of 60 years. In the testimony that we have called attention to showing his condition prior to his reaching the age of 60, the doctors did disagree, but there was credible testimony that indicated plaintiff was not totally and permanently disabled. A jury question undoubtedly was presented, and there was sufficient evidence to support the verdict. Under the circumstances, this Court will not set it aside even if it might be in doubt as to the ultimate facts. *Alley* v. *Klotz,* 320 Mich. 521, and the cases therein cited.

The court instructed the jury that the main issue was whether plaintiff was totally and permanently disabled on March 1, 1946. He also instructed them to determine whether after reaching the age of 60 on December 5, 1946, plaintiff was totally and permanently disabled so as to exempt him from further premiums on the policies and entitle him to the return of all sums he had paid for such premiums after he reached the age of 60. Taking the judge's charge as a whole, we believe it presented the issues in a very fair manner. Appellant complains, however, that the judge injected the question of partial disability into the case and instructed the jury to distinguish between total and partial disability. We believe the instruction was proper. There is no question but that at the time plaintiff took out his policies, he already was partially disabled and has been so ever since. If plaintiff was not totally but only partially disabled before he reached the age of 60, he could not recover; that was one of the main questions in the case. See *Wetherall* v. *Equitable*

*Life Assurance Society of the United States,* 273
Mich. 580, which however, only refers to permanent
disability.

Another question that arose in the case was the
fact that five jurors on the *voir dire* testified that
they had policies in defendant company. Plaintiff's
attorney stated that his client asked that they be
challenged for cause. Attention is called to cases
in which we have consistently held that where a suit
is brought against a mutual insurance company, a
juror who belongs to such company should be ex-
cused for cause. Such was not the instant case. De-
fendant exercised one peremptory challenge and
thus excused one of the jurors who had a policy in
defendant company. The policy of one of the jurors
who was not excused was a paid-up policy. The
types of policies of the other jurors were not dis-
closed on the examination. Appellant, however,
claims that the dividends on the policies are deter-
mined partially by the losses which the company
must pay each year, and that, therefore, the jurors
had a financial interest in the outcome of the litiga-
tion. There was no showing of the provisions, if
any, with respect to the dividends in the policies.
Plaintiff concedes that the policies issued by defend-
ant were nonassessable.

The judge interrogated the jurors very carefully.
He held that their interests in the outcome of the
case were too remote to affect their judgment. As
a matter of fact it might be argued that a juror
might even resent the refusal to pay a just claim by
a nonmutual company in which he held a nonasses-
sable policy. Our attention is not called to any case
where the same question arose except in cases in-
volving mutual insurance companies. In *City of
Detroit* v. *Detroit Railway,* 134 Mich. 11 (104 Am.
St. Rep. 600), it was held that it was not error for
the trial court to overrule challenges to jurors on

the ground that they were taxpayers of the city, a party to the cause, and that their interest was too remote.

We, however, need not decide this question in the instant case for plaintiff had five peremptory challenges remaining,* none of which he used. Plaintiff claims, however, that had he exercised his peremptory challenges he might have exhausted them so that he would not have any left if other jurors called in place of those peremptorily challenged might prove objectionable. Such a situation did not arise, however. Had it arisen appellant would still have a right to present his claim of error to this Court. Under the circumstances, we find no error in the instant case. Appellant cannot claim benefit from error which he might have corrected at the time of trial by exercising his peremptory challenges.

The rule in this State is that a party cannot complain of error in the overruling of a challenge for cause if it does not force him to exhaust his peremptory challenges. In *Stowell* v. *Standard Oil Co.,* 139 Mich. 18 (17 Am. Neg. Rep. 569), the defendant challenged a juror for cause after answers on the *voir dire* as to the propriety of blowing out a kerosene lamp and the challenge was overruled and an exception taken. On appeal, the Court said on page 20:

"A complete answer is that the defendant was not harmed by the ruling, as but one peremptory challenge was exercised, and we are satisfied that the defendant could have amply protected itself in all doubtful cases by the exercise of its remaining peremptory challenges."

To the same effect see, *Sullings* v. *Shakespeare,* 46 Mich. 408 (41 Am. Rep. 166); *People* v. *Aplin,* 86

* See 3 Comp. Laws 1929, § 14291 (Stat. Ann. § 27.1020).—REPORTER.

Mich. 393; *William R. Roach & Co. v. Blair,* 190 Mich. 11; *Walz* v. *Peninsular Fire Ins. Co.,* 221 Mich. 326; *Church* v. *Stoldt,* 215 Mich. 469; *Link* v. *Fahey,* 200 Mich. 308; *Webster* v. *Stewart,* 210 Mich. 13. There are many others to the same general effect and the rule stated seems to be supported by the weight of authority in other jurisdictions as shown by the cases cited in 50 C.J.S. p. 1017 and 31 Am. Jur. p. 646.

Plaintiff relies on the minority opinion in *Forman* v. *Prudential Insurance Company of America,* 310 Mich. 145, where the facts differ. The majority opinion decided the case on a question not involved in the instant case.

Plaintiff strenuously contends that the way in which the question of partial disability was presented by the judge gave the jury an opportunity to bring in a compromise verdict, and that it did this in rendering a verdict for the premiums that were paid after plaintiff reached the age of 60. It was proper for the judge to submit the questions to the jury in the manner he did, and the verdict will not be disturbed. The charge taken as a whole, even though not couched in the language submitted by plaintiff's attorney in his requests to charge, was a very fair one and clearly defined the issues. The case has been twice tried before a jury with a verdict in favor of defendant. The jury saw the witnesses. The judge in no way restricted plaintiff in his proofs. He permitted him to show his bare foot to the jury. Credible and substantial testimony supported the defendant's claims. We have given a bare outline of the main testimony. Many more facts both favorable and unfavorable could be detailed, but we find it unnecessary. The issues of fact were ably and well presented by counsel for the respective parties. Other questions raised by plaintiff have been exam-

ined. We find them not of sufficient merit to require further discussion. We find no error in the case. Judgment is affirmed, with costs to defendant.

BUSHNELL, C. J., and SHARPE, BOYLES, REID, NORTH, DETHMERS, and CARR, JJ., concurred.