Frank CARPENTER as Trustee in Bankruptcy of the Estate of Greenville Paper Stock Company, Inc., Bankrupt, Appellant,

v.

UNION INSURANCE SOCIETY OF CANTON, LIMITED, Northern Insurance Company, American Aviation & General Insurance Company, Assurance Company of America, Home Insurance Company, Pacific Fire Insurance Company, Maryland Casualty Company, Buffalo Insurance Company, Merchants Fire Assurance Corporation, Travelers Fire Insurance Company, North River Insurance Company, Insurance Company of North America, Fireman's Fund Insurance Company and National Fire Insurance Company, Appellees.

No. 8129.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 10, 1960.

Decided Nov. 18, 1960.

Ray R. Williams, Greenville, S. C. (J. A. Henry, Hubert E. Nolin, Greenville, S. C., and Williams & Henry, Greenville, S. C., on brief), for appellant.

Bert Cotton, New York City, and Wesley M. Walker, Greenville, S. C. (Leatherwood, Walker, Todd & Mann, Greenville, S. C., and Rein, Mound & Cotton, New York City, on brief), for appellees.

Before SOPER and BOREMAN, Circuit Judges, and STANLEY, District Judge.

BOREMAN, Circuit Judge.

The plaintiff, Trustee in Bankruptcy for the Greenville Paper Stock Company, Inc., hereinafter referred to as "Greenville," brought this action on fire insurance policies issued by the defendants to recover the amount of a fire loss sustained by Greenville in a fire occurring at its plant in Greenville, South Carolina, on January 13, 1956. The finding in favor of the defendants on their third affirmative defense of arson, by the Special Master appointed to hear the case, was sustained on review by the District Court for the Western District of South Carolina. We conclude the evidence was sufficient to sustain this defense.

At the time of the fire, Greenville was wholly owned by one Alvin Garblik, hereinafter referred to as "Garblik," and by members of his family. Prior to Garblik's acquisition, Greenville had traded as the Piedmont Scrap and Metal Company at a location on the New Buncombe Road outside of the corporate limits of Greenville, South Carolina. When Garblik and his family purchased the company in May 1955 Garblik became the new president and sole manager. In late 1955 Garblik sought to locate the plant in a larger structure, selecting a location at 2–6 Rutherford Street, within the corporate limits of the City of Green-

ville. City Fire Department objections to the processing of Greenville's flammable goods within the city limits interrupted the lease negotiations, but were overruled by the City Building Commission upon agreement by Greenville's lessor to install a sprinkler system and make other improvements on the premises. Greenville subsequently occupied the Rutherford Street building and commenced operations on or about December 1, 1955.

At this time Greenville was engaged solely in the processing, sorting and packing of textile remnants. The principal types of fabrics handled by Greenville included acetates, rayon acetates, orlons, dacron and cotton blends, nylon and viscose blends, viscose and acetate blends, acetate and cotton, viscose and cotton, and cotton. To prepare the textile remnants for sale, the defective and soiled parts were torn or cut away from the merchantable fabric, and the remaining pieces, along with the nondefective remnants, were sorted into bins according to their general types and grades. When the bins became sufficiently full, they were removed and the fabric was then either packed in paper cartons or more generally baled in power presses. When baled, paper was wrapped around the outer sides of the remnants, and a burlap covering was secured about the outside with metal bands.

The Rutherford Street plant was built on three levels. The first, which faced Rutherford Street, contained the offices. The second, which was several feet lower and behind the first level, consisted of a large room approximately seventy by eighty feet in size, equipped with twenty-three large bins for use in the sorting operation. The third level, which dropped several feet behind the second, measured approximately twenty-one by forty-two feet in area, was equipped with a scale and two baling presses, and was used for the packing and storage of the remnants. There was a brick wall separating the second and third levels with three openings therein measuring, respectively, twelve by twelve, nine by nine, and nine by four feet. A wooden ramp connected the second and third levels at the largest opening in the brick wall, and wooden steps connected the various levels at all other passageways.

On the day of the fire, January 13, 1956, the third level storage area was filled to within fifteen bales of capacity with bales stacked end on end, one against the other, from the wall out into the work area. An aisle of about six feet in width was left in the center of the third level, and an area of approximately twelve square feet was open around the baling presses and the scales. Boxes of recently received rayon remnants were stacked on top of the bales lining the aisleway. Throughout the day three men worked in this area, and on the second level the women employees sorted and processed remnants under the supervision of one Alfred D'Ambrosio. On the first level Garblik worked along with his secretary and the bookkeeper. At five o'clock that evening the employees left work, with Garblik and D'Ambrosio being the last to depart. Garblik was to drive D'Ambrosio home and, on leaving the plant, the two walked to the parking lot on the north side of the building and entered Garblik's automobile. Deciding to have a beer after they had gotten into the car, Garblik then drove around the plant and parked in a small lot on the south side of the building, from which point they walked to an establishment across the street from the plant. After finishing their beer they returned to the car, but before entering it D'Ambrosio walked down an alley behind the plant allegedly to investigate a shed adjacent to the building. After D'Ambrosio returned to the car, the two men proceeded to a service station located approximately nine-tenths of a mile from the plant in the opposite direction from D'Ambrosio's home. After the car had been serviced, Garblik and D'Ambrosio drove back towards the plant, stopping and parking in front of another restaurant across from the plant where they had a coffee. After the coffee was finished, the day being rather cold and windy, Garblik,

accompanied by D'Ambrosio, re-entered the plant building so that Garblik might obtain his overcoat. When this was done they departed for D'Ambrosio's home at approximately five-thirty or five-thirty-five, the time by their own reckoning being based on their prior activities.

Within approximately ten minutes of their final departure from the plant, one Henry Irby, a grocery delivery boy, noticed a small white fire in the third level as he walked down the alley behind the plant. Irby immediately proceeded up the alley to report the fire to his employer, Philip Howard. Rushing to the back of his store, Howard saw the rear of the Greenville plant enveloped in an explosion which shattered its windows with a "whooshing noise" and shot flames forty to fifty feet into the air and out onto the ground. Howard telephoned the City Fire Department and, on receipt of the alarm at five-fifty-four, fifty to sixty firemen were dispatched to the site. When they arrived the entire third level was enveloped in flames, the fire billowing out of the windows and coming from between and under the stored bales. The fire in this area burned out of control for thirty to forty minutes. All of the doors and windows of the plant were securely locked and entrance in every instance had to be obtained forcibly. After approximately twenty minutes, one fireman attempted to enter the third level through a broken doorway but was shortly overcome by the unusual fumes. Although the main part of the conflagration was in the third level, a separate and distinct fire was burning in the bottom of a sorting bin in the second level, adjacent to the partition wall of the first level. A blackened and burned trail was discovered on the floor leading from the second level down the ramp into the third level.

Garblik had just arrived at the D'Ambrosio home when he heard the car radio announcement of the fire, and he immediately returned to the plant. Later that evening he returned to the plant and his office to retrieve a "valuable paper" assertedly left about his desk and worth fifteen thousand dollars. This document was never identified or explained.

As a result of the fire, Greenville's entire remnant inventory was either burned or severely damaged. The building's wooden overhead beams, the wooden ramp from the second to the third level, some of the wooden partitions, and the skylights and the roof had to be replaced, and the metal baling presses were so damaged as to have only junk value. Six months after the fire, a petition in bankruptcy was filed against Greenville and on July 25, 1956, Greenville was adjudged bankrupt, the plaintiff being duly elected trustee. The insurance policies upon which the plaintiff then brought this action covered a risk in the aggregate amount of $150,000.

By an order of the District Court and with the consent of all parties, the cause was referred to a Special Master for the taking of testimony and the determination of all issues of law and fact. The trial commenced before the Master on January 14, 1959, and continued through February 5, 1959. After this trial and the transcription of testimony, the filing of briefs and presentation of oral arguments, the Master filed his report sustaining the affirmative defenses of fraud and false swearing and of arson. The plaintiff filed objections thereto and, after the submission of briefs and argument to the District Court, judgment was entered for the defendants sustaining the defense of arson. The plaintiff has appealed therefrom to this court.

■ The principal assignment of error on appeal is the insufficiency of evidence to support the Master's findings of arson. The trial of this cause before the Master consumed sixteen full days and was concerned almost entirely with issues of fact. On the basis of the nearly twenty-five hundred pages of recorded testimony and the several hundred exhibits, the Master found "clear and convincing proof" that the loss was occasioned by an incendiary fire for which Garblik, and hence Greenville, was responsible. In its confirmation of this

finding on review, the District Court said:

"After a review of the evidence and consideration of oral arguments by counsel, as well as written briefs submitted by them, I cannot say that the Finding of Facts of the Special Master as to the third affirmative defense of the defendants [i. e. arson] is clearly erroneous, and for this reason this finding by the Special Master should be, and it is hereby confirmed."

The plaintiff's objections and exceptions to the findings of the Master therefore received a full and adequate review in the District Court. While that court is not bound by the findings of such a Master, nevertheless the Master's findings are entitled to special weight, and though they are not to be given the effect of a jury verdict the rule for the exercise of the discretion vested in the District Court on review is that such findings shall be accepted unless clearly erroneous. United States v. Twin City Power Co., 4 Cir., 1957, 248 F.2d 108.

The extensive evidence upon which these findings were based is conflicting in almost every aspect. In respect to the scope of review vested in this Court on appeal from the findings of a Master as affirmed and embodied in the conclusion of a District Court, a standard similar to that below applies. As this Court stated in Stonega Coke & Coal Co. v. Price, 4 Cir., 1939, 106 F.2d 411, 417, speaking through Judge Parker:

"It is provided by Rule 52(a) of the Rules of Civil Procedure, 28 U.S. C.A. following section 723c, that findings of fact shall not be set aside unless clearly erroneous, and that the findings of a master, to the extent that the court adopts them, shall be considered as findings of the court. This rule is grounded in wisdom and is but the formulation of practice long prevailing in courts of equity. Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46. It is a rule to be followed in all cases but particularly in one like this where there is a great volume of highly conflicting testimony, and where the master who had the advantage of seeing and hearing the witnesses is a highly trained lawyer of wide experience * * *. After findings by such a master have been reviewed and affirmed by the judge below, who is himself a lawyer of wide knowledge and experience in this sort of litigation, it must be indeed a very clear case of error which would justify an appellate court in disturbing them."

Accord, Crimmins v. Woodson, 4 Cir., 1949, 177 F.2d 788; N. L. R. B. v. Standard Trouser Co., 4 Cir., 1947, 162 F.2d 1012.

In light of these principles it is unnecessary and would be of little avail for this Court to attempt a complete and exhaustive interpretation of the great body of evidence in this case. A summary review of the important aspects of the evidence will demonstrate the substantial basis present in support of the conclusions of the Master as affirmed by the District Court.

■■ The evidence, beyond the fact of the burning itself, was almost wholly circumstantial. In an arson case the corpus delicti consists of two elements: (1) The burned structure and (2) the criminal act of some person in causing the burning. By the very clandestine nature of the act, it is generally incapable of direct proof and the evidence is necessarily often of a negative character. State v. Edwards, 1934, 173 S.C. 161, 175 S.E. 277. The weight of authority is undoubtedly to the effect that the opportunity for the commission of, and the motive inducing the arson may be established by circumstantial evidence. State v. Jones, 1939, 215 N.C. 660, 2 S.E.2d 867, State v. Brown, 1915, 103 S.C. 437, 88 S.E. 21, L.R.A.1916D, 1295. The question upon review is whether the inferences drawn from this evidence were reasonable, and whether in the face of alternative inferences, they were clearly erroneous.

## The Motive for Arson

■ There was evidence from which it could be found that during the period immediately preceding the fire, Greenville was at the very least in a highly disturbed and precarious financial condition, if not in fact on the brink of bankruptcy. There was evidence of indebtedness to a factor in late 1955 of approximately $87,927.01 against which this factor held accounts receivable of only $52,342.57; of the procurement of a June 30, 1955, inventory audit which proved unacceptable for the arrangement of a desired bank loan; of the presentation of invoices to a new factor following November 4, 1955, in the amount of $21,000 which invoices were at the time offset by the indebtedness of Greenville to the customers for whom they were issued of $34,000; that the new factor additionally received invoices for a sale and repurchase agreement with one McCarter Textile Company which was financed by a continuing cycle of further sales and repurchases, Garblik himself being uncertain whether physical delivery was made on any of these purported transactions; of the presentation to the factor of invoices for purported sales to an exporter which, in fact, were only "bill and hold" reserve orders; of a net operating loss of approximately $65,000 for the last half of 1955; of a three to four-week delay in the performance of a purchase of materials agreement which was consummated only by the endorsement by a local merchant of an otherwise insufficiently funded Greenville check; of the dishonor of the January 6, 1956, payroll checks; of an offer to pay twenty per cent interest for a loan on January 9, 1956, which offer was refused on January 12; of a total checking account balance in both a South Carolina and a New York bank on January 13, 1956, of only $1,817.05 which included a deposit in the South Carolina bank of $1,000 by means of a check which had not yet cleared the New York bank account, and which was offset by the previously dishonored payroll checks, a $15,000 check for purchase of materials negotiated only on the endorsement of a third person, overdue fire insurance premium checks for $1,225.67, and a check for the overdue payment for the June 30, 1955, audit in the amount of $269.60.

There was further evidence of the arrangement of Greenville's affairs immediately before the fire which could reasonably be construed as in preparation for a contemplated arson. There was evidence of a much smaller inventory than that claimed as destroyed. There was evidence that Garblik deposited his salary and personal expense checks for the prior five weeks on January 11, 1956, only two days before the fire; that payment for the June 30, 1955, audit, which was subsequently asserted as proof of the inventory loss, was made by check on the very day of the fire; that the long overdue premiums on the fire insurance policies, some due and unpaid as far back as May 1955, were not paid until the week of the fire; that within the week preceding the fire, the insurance coverage was increased from $125,000 to $150,000; and that the fire occurred on the eve of the day when the premises were surveyed for installation of the sprinkler system, and shortly before the fire preventive improvements were to be installed.

These various circumstances appear to us sufficient to warrant the inference of motive for the commission of the alleged arson. We now consider the evidence as it tended to show the opportunity for and the act of incendiarism by Garblik.

## The Commission of the Arson

Garblik's continuous presence on or about the premises on the day and evening of the fire clearly discloses the opportunity for the commission of the arson. After having worked in the plant throughout the day, Garblik and D'Ambrosio were the last to leave, securely locking the premises. Although Garblik was then to have driven D'Ambrosio home, they first drove Garblik's automobile from one side of the plant to the other, then walked across the street to have a beer; upon returning to the au-

tomobile, D'Ambrosio first walked behind the plant to investigate the rear alley; they then drove some several blocks in the opposite direction from D'Ambrosio's home, allegedly to get gasoline and have the car serviced; they next returned to park the car across the street from the plant, going into another restaurant, this time for coffee even though on the way home for dinner; then they returned to the plant building to obtain Garblik's overcoat, which until this time he had allegedly forgotten even though it was a cold day. By their own testimony, Garblik and D'Ambrosio had in this manner hovered about the plant until approximately five-thirty or five-thirty-five, which was only about ten minutes before the discovery of the fire. Throughout this time the building was securely locked so as to have precluded the entry of any other person. Garblik's admitted activities prior to the fire thus placed him in sufficient proximity to the premises to have afforded him the opportunity to have caused the fire. The circumstances surrounding his contact with the building do more than excite suspicion; they exclude any rational conclusion that if a fire were set, it could have been set by some unknown third person. See State v. Jones, 1939, 215 N.C. 660, 2 S.E.2d 867.

Next we proceed to the final and crucial inquiry involving the evidence relating to the act of incendiarism itself. Within approximately ten minutes of Garblik's final departure, Henry Irby noticed a small white fire, apparently on the floor of the third level. By the time he had covered the short distance up the alley to notify his employer, the entire third level of the plant erupted in a violent explosion, igniting a fire which rapidly enveloped the entire level and burning out of control for approximately one-half hour. The evidence further disclosed that while Greenville's goods were highly inflammable, the phenomenon of the sudden explosion occurred in the level containing the baled material, in spite of the fact that the burlap covering of these bales was characteristically slow burning or smoldering; that this covering must necessarily have burned away before the enclosed synthetics could have ignited; that spot fires were burning from under and between the tightly packed bales; that there were two distinct fires, one burning from the bottom of a bin in the front section of the second level, apart from the fire in the third level; and that the fire emitted a peculiar odor and fumes which eventually overcame one of the firemen. Additional evidence negated the presence of faulty electrical or gas fixtures, paint or rags, or, due to the short period of operation and the constant moving of the goods, of an accumulation of lint sufficient to have allowed for spontaneous combustion or any other accidental source of ignition. In the absence of any evidence of an accidental cause, the reasonable inference therefore arises that Garblik, with his special knowledge of textile chemistry, could have strategically deployed portions of his synthetics which, by their inherently highly inflammable character, could themselves have been set as the fuse to kindle the explosion. In the absence of any proof of any other substance used to ignite the fire, the Master, considering the fact that many of the inventory materials, when burned, were totally consumed without leaving a trace, adopted the inference, stating:

> "* * * it is quite clear that the active agent in this fire was a volatile inflammable material not normally to be found in the building in question and not inherent in the materials we knew to have been in the building, *certainly when strongly packed in bales or enclosed in cartons.* (Emphasis supplied.)

> "I find that there is no other explanation of the cause of this fire than that of the presence of a volatile inflammatory material and though I would like to report its name and formula, nevertheless, without such knowledge the material was no less effective for the purpose that it was used."

**162**

The plaintiff urges as an additional assignment of error the admission at the hearing of the testimony of firemen as to the cause of the fire when they admitted a lack of experience with fires involving the types of synthetics contained in Greenville's inventory. While these witnesses were familiar with the burning qualities of the burlap coverings on the bales of destroyed goods, and even though the Master expressly stated that his conclusion was reached "independent of these opinions," the expert testimony of firemen is admissible to explain the phenomenon of a sudden and violent fire of unascertainable origin. For an excellent discussion see First Nat'l Bank v. Fire Ass'n, 1898, 33 Or. 172, 50 P. 568, 53 P. 8.

The plaintiff contends that the Master erred in that he followed the rule applicable in the ordinary civil action and based his decision upon a preponderance of the evidence; that here, the defense was based upon the alleged criminal act of arson thus requiring the application of a different rule. On the record this contention is without merit as the Master very clearly stated:

"Now if this was an incendiary fire for the purpose of collecting insurance it was a fraudulent fire. Fraud is never presumed and must be proven by evidence clear and convincing. Metropolitan Life Ins. Co. vs. Stuckey, (1940), 194 S.C. 469, 10 S.E.2d 3; Able vs. Equitable Life, etc., (1938), 186 S.C. 381, 195 S.E. 652; 26 C.J. 542."

This is fully in accord with the general principle that the burden of proof of an act of a criminal nature asserted as a defense in a civil action is somewhere in between the standard requirement of proof beyond a reasonable doubt in a criminal case and the preponderance of evidence requirement in the ordinary civil case. The proper test is that such defense be established by clear and convincing proof; that it be shown by "clear and satisfactory evidence to a reasonable certainty." Ziegler v. Hustisford Farmers Mut. Ins. Co., 1941, 238 Wis.

238, 298 N.W. 610; 7 Wigmore, Evidence § 2498(3) (3d ed. 1940). The correct evidentiary test as to the defense of arson was here applied.

The decision of the Master as approved and confirmed by the District Court is

Affirmed.