GEORGE v TRAVELERS INDEMNITY COMPANY

1. Insurance—Arson—Burden of Proof—Insurers.

The burden is placed on the insurer who raises an arson defense to prove by a preponderance of the evidence that the plaintiff set fire to the building or caused it to be set on fire.

2. Arson—Elements—Circumstantial Evidence—Motive—Opportunity—Incendiary Origins.

The elements of arson may be established by circumstantial evidence; Michigan courts have affirmed arson convictions based on circumstantial evidence of motive, such as insurance coupled with business difficulties, plus opportunity, such as access to the building where there is independent evidence of the incendiary origins of the fire.

3. Insurance—Arson—Direct Evidence—Circumstantial Evidence—Motive—Opportunity—Incendiary Origins.

There was enough direct and circumstantial evidence of motive, opportunity and incendiary cause for a jury to find that an arson defense was established by defendant insurers, in an action for damages for the alleged failure of the insurers to honor the terms of policies covering the plaintiff's property and business, where it was undisputed that the fire resulted from arson, the plaintiffs were heavily insured, the plaintiffs had easy access to the building, and there was evidence from which the jury could conclude that the plaintiffs' corporation was heavily in debt as well as evidence suggesting that community hostility against the plaintiffs had made it unprofitable, if not impossible, to carry on business.

References for Points in Headnotes

[1] 5 Am Jur 2d, Arson and Related Offenses §§ 42, 46–53.
[2] 5 Am Jur 2d, Arson and Related Offenses §§ 47, 52, 53.
[3] 5 Am Jur 2d, Arson and Related Offenses §§ 42, 47, 52, 53.
[4] 5 Am Jur 2d, Arson and Related Offenses §§ 46–58.
[5–7] 75 Am Jur 2d, Trial §§ 283–285, 1012.
[7] 5 Am Jur 2d, Appeal and Error §§ 624, 722.
[8] 5 Am Jur 2d, Appeal and Error §§ 600, 835.

4. EVIDENCE—INFERENCES—FACTS—CIRCUMSTANTIAL EVIDENCE—DI-
RECT EVIDENCE.

A conclusion cannot be inferred from a fact which was itself
derived inferentially from circumstantial evidence; however,
where two distinct lines of argument, each based on an infer-
ence from different direct evidence converge on the same
conclusion, it is not necessary to base an inference on an
inference for either argument.

5. TRIAL—APPEALS TO PREJUDICE—RACE—RELIGION—NATIONALITY.

The law is blind to differences in race, religion, and nationality;
appeals to prejudice, whether overt or covert, have no place in
the administration of justice.

6. TRIAL—APPEALS TO PREJUDICE—ETHNIC ALLUSIONS—APPEAL AND
ERROR.

It is reversible error to deny the opposing party a fair trial by
making irrelevant and inflammatory ethnic allusions.

7. APPEAL AND ERROR—APPEALS TO PREJUDICE—NATIONAL ORIGINS—
RELEVANCE—OVERKILL.

The Court of Appeals, in evaluating the possible prejudice result-
ing from a defense counsel's protracted inquiry on cross-exami-
nation into the plaintiffs' national origins, looks to whether the
questions were relevant to the issues and, if not, whether they
were calculated to arouse prejudice; the Court will look to see if
defense counsel indulged in unnecessary overkill instead of
pursuing a limited, focused inquiry into areas relevant to the
issues.

8. APPEAL AND ERROR—EVIDENCE—FAILURE TO OBJECT—REASONS FOR
OBJECTION—MANIFEST INJUSTICE—CURATIVE INSTRUCTIONS.

Failure to object specifically and for proper reasons to the admis-
sion of evidence precludes appellate review unless there is
manifest injustice; failure to request a curative instruction
forecloses appellate review unless the remarks of counsel are so
prejudicial as to be irreparable by a cautionary instruction.

Appeal from Wayne, John R. Kirwan, J. Submit-
ted December 12, 1977, at Detroit. (Docket No.
30158.) Decided February 6, 1978. Leave to appeal
applied for.

Complaint by Harry George and Bahjat M. Yal-
doo, individually and as corporate officers in behalf
of True Value Supermarket, Inc., and True Value

Supermarket, Inc., against Travelers Indemnity Company, American Home Assurance Company, Allstar Insurance Corporation, and Jefferson Insurance Company of New York for damages based on the alleged failure of defendants to honor the terms of policies covering the value of the supermarket, its contents, and for business interruption after the supermarket was destroyed by fire. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Costello & Barkey, P. C.,* for plaintiffs.

*Ross, Soloy & Kochansky,* for American Home Assurance Company and Jefferson Insurance Company of New York.

*Denenberg, Tuffley & Thorpe* (by *Charles R. Tuffley* and *Ilene Gordon),* for Travelers Indemnity Company.

Before: N. J. KAUFMAN, P. J., and BRONSON and D. E. HOLBROOK, JJ.

N. J. KAUFMAN, P. J. This appeal arises out of an action for damages based on the alleged failure of defendant insurance companies to honor the terms of policies covering plaintiffs for the value of a True Value Supermarket, for the contents therein, and for business interruption, after the supermarket burned down on October 31, 1971. At the time of the fire, plaintiff Harry George, the president and sole stockholder of True Value Supermarket, Inc., owed $15,000 to plaintiff Bahjat Yaldoo. Yaldoo was vice-president and director and also managed the store until September 1971. Plaintiffs appeal from a jury verdict of no cause of action as to all claims, which was returned on June 15, 1976, after a lengthy trial.

There was considerable testimony, including admissions by plaintiffs themselves, tending to show that there had been serious trouble with residents of the local community in the period immediately preceding the fire. Yaldoo had an armed confrontation with local youths which led to the circulation of leaflets accusing him of racism and proposing a boycott of the store. The store was picketed and its windows were smashed, as were the windows of Yaldoo's car. Yaldoo was forced to give up his position as manager. He was replaced by Edward George, Harry George's son.

The captain of the arson section of the Detroit Fire Department, Michael Buschbacher, testified without objection that when he questioned Edward George after the fire, Edward George told him that he had received threats ranging from "beating him up to burning the building", and that because the store had been "harassed by picketing" it had closed earlier than it used to. At trial, Edward George denied saying this. The president of the company which serviced the store's burglar alarm system testified that he had to make frequent service calls throughout October, 1971, to repair the system because it was connected to store windows which were repeatedly broken. His statement that the store was closed for two weeks in October was denied by both Harry and Edward George.

Captain Buschbacher, who investigated the blaze, testified that in his opinion it had been deliberately set. Indeed, Lhevinne Pickett, a defense witness, testified that he set the fire at the store. He explained he was hired by one Hazim Saeegh, who gave him detailed instructions as to when to arrive at the store, how to get in and hide until closing time, where to find the charcoal lighter fluid needed to start the fire, and where to

find an axe with which to break out and get away afterwards. There was no objection to any of this testimony. The trial court did sustain an objection to a question as to what Saeegh told Pickett with respect to the burglar alarm. However, Pickett did testify without objection that he asked Saeegh if the burglar alarm would be on, and he also testified that when he left the store, the alarm did not go off. Over a general objection that the matter was inadmissible and prejudicial, Pickett answered affirmatively the question of whether Saeegh told him why the store was being burned. An objection to a question asking what Saeegh told Pickett was sustained.

Hazim Saeegh was not called as a witness. Harry George and Bahjat Yaldoo denied knowing either Saeegh or Pickett. Pickett said he did not know either of the plaintiffs and did not know who owned the store he burned. Pickett did testify, though, that the day after the setting of the fire, Saeegh drove him to the parking lot of a Food Farm Market; Saeegh went inside and returned with $1,600 or $2,000 for Pickett. Harry George admitted that he owned a 30% interest in the Food Farm store.

During cross-examination of the plaintiffs and another of their witnesses, defense counsel repeatedly asked questions relating to the Chaldean national origins of George and Yaldoo. Counsel asked if the previous owners of the True Value Supermarket were Chaldean. He also asked: "What is a Kaldean [sic]?" There were no objections to these questions. When there was objection to additional inquiry about Chaldean markets, defense counsel justified the questioning as relevant to the witness's credibility because he derived a great deal of business from Chaldean clients.

There was no contrary argument and the trial court permitted defense counsel to elicit the fact that the witness's agency derived about $10,000 in income from Chaldean markets in 1970–1971.

On cross-examination, Edward George was asked if his new wholesale business sold mainly to Chaldean markets. There was no objection.

On cross-examination, Harry George was questioned at great length about his Chaldean nationality, the size of the Detroit Chaldean community, whether the community is "closeknit", whether Chaldeans attend a particular church, whether there is a Detroit-area Chaldean telephone directory, and whether Harry George had sponsored or assisted Chaldean immigrants to the United States. The only objection was to the question whether the Chaldean community was closeknit. Counsel for Harry George objected that "the Kaldean *[sic]* community here has nothing to do with this trial. It is immaterial and irrelevant". Defense counsel responded that "we intend to prove in this case that there was a—that the individual who was hired to set this particular fire was in fact hired by a gentleman who was Kaldean *[sic]*, as opposed to the theory of the Plaintiff in this case, which I think is obvious". He suggested that inquiry would be relevant if the Chaldean community was very small, and the trial judge allowed him to ask about that.

There was never any testimony to the effect that Saeegh was a Chaldean. In proceedings out of the presence of the jury, the trial court sustained an objection by the plaintiffs when defense counsel asked Pickett whether Saeegh was a Chaldean. The only source of Pickett's knowledge of Saeegh's nationality was hearsay, which was not allowed into evidence.

On appeal, plaintiffs raise several issues; only the one regarding the questioning of plaintiffs and their witnesses merits extended discussion.

Initially, however, it is necessary to review the evidence presented at trial as it relates to the legal defense offered by defendant to build the proper foundation from which to dispose of plaintiffs' major contention.

Where an arson defense is raised by an insurer, the burden is on the insurer to prove by a preponderance of the evidence that the plaintiff set fire to the building or caused it to be set on fire. *Walz v Peninsular Fire Insurance Co,* 221 Mich 326, 343; 191 NW 230 (1922). The elements of arson may be established by circumstantial evidence. *People v Porter,* 269 Mich 284, 292; 257 NW 705 (1934), *Peterson v Oceana Circuit Judge,* 243 Mich 215, 217; 219 NW 934 (1928). Where there is independent evidence of the incendiary origins of a fire, Michigan courts have affirmed arson convictions based on circumstantial evidence of motive (such as insurance coupled with business difficulties) plus opportunity (such as access to the building). *People v Dorrikas,* 354 Mich 303, 307–308; 92 NW2d 305 (1958), *People v Bailey,* 42 Mich App 359, 361–363; 202 NW2d 557 (1972), *People v Horowitz,* 37 Mich App 151, 153–158; 194 NW2d 375 (1971), *lv den,* 387 Mich 753 (1972).

In this case, it was undisputed that the fire resulted from arson. The plaintiffs were heavily insured and there was evidence from which the jury could conclude that the corporation was heavily in debt as well as evidence suggesting that community hostility had made it unprofitable, if not impossible, to carry on the business. Plaintiffs presented contrary evidence, but it was for the jury to decide what to believe and what to disbe-

lieve. *People v Fuller,* 395 Mich 451, 453; 236 NW2d 58 (1975), *People v Chamblis,* 395 Mich 408, 420–421; 236 NW2d 473 (1975). Of course, the plaintiffs had easy access to their own store. George owned the corporation and had keys to the store, and Yaldoo had managed the store until a few weeks before the fire. The jury could believe that one or the other of these men was sufficiently familiar with the store to furnish the detailed instructions successfully followed by the arsonist Pickett. There was enough direct and circumstantial evidence of motive, opportunity and incendiary cause for the jury to find that the arson defense was established.

Plaintiffs contend, however, that on these facts the conclusion that they are responsible for starting the fire stems from the impermissible pyramiding of inferences. A conclusion cannot be inferred from a fact which was itself derived inferentially from circumstantial evidence. *People v Atley,* 392 Mich 298, 314–316; 220 NW2d 465 (1974), *People v Jacobson,* 72 Mich App 489, 497; 250 NW2d 105 (1976), *People v Little,* 58 Mich App 12, 16; 226 NW2d 735 (1975). Plaintiffs stress the fact that, though Pickett admitted burning the store for Saeegh, there was no evidence linking Saeegh to the plaintiffs. But this criticism has nothing to do with the pyramiding of inferences. The evidence that Saeegh hired Pickett to burn the store is direct, not circumstantial. From the direct evidence furnished by Pickett's testimony the jury might reasonably infer that Saeegh was acting at the behest of someone who had a motive for the burning of the store. We have already seen that, even if Pickett had never testified, there was circumstantial evidence of plaintiffs' responsibility for the fire. The conclusion that plaintiffs insti-

gated the fire was strengthened, not weakened, by Pickett's testimony. Two distinct lines of argument, each based on an inference from different direct evidence, converged on the same conclusion. For neither argument was it necessary to base an inference on an inference.

As noted earlier, the issue which arouses our greatest concern in this case is the possible prejudice resulting from defense counsel's protracted inquiry into the plaintiffs' Chaldean ethnic affiliation during cross-examination.[1] Even in the occasional case where racial, ethnic, or religious matters are relevant to the issues,[2] there is always the risk of incidentally arousing prejudice—and this Court abhors injecting the poison of prejudice into any legal proceeding. The law is blind to differences in race, religion, and nationality. Appeals to prejudice—overt or covert—have no place in the administration of justice. It is reversible error to deny the opposing party a fair trial by making irrelevant and inflammatory ethnic allusions. *Nemet v Friedland,* 273 Mich 692, 697; 263 NW 889 (1935), *Solomon v Stewart,* 184 Mich 506, 511; 151 NW 716; Am Ann Cas 1917A, 942 (1915), *Cluett v Rosenthal,* 100 Mich 193, 199–200; 58 NW 1009; 43 Am St 446 (1894). Any effort to arouse the prejudice of the jury "cannot be overlooked, nor can it ever, in the final analysis, prove other than detrimental to the interests of the litigant whose counsel resorts to such a course". *Solomon v Stewart, supra,* at 511. In evaluating the ethnic allusions in this case, we look to whether the questions were relevant to the issues and, if not, whether they were calculated to arouse prejudice.[3]

---

[1] A portion of this questioning is reproduced in the Appendix.

[2] An example would be an interracial identification situation. *See, e.g., People v Flinnon,* 78 Mich App 380; 260 NW2d 106 (1977).

[3] *See* Anno: *Statement by counsel relating to race, nationality, or religion in civil action as prejudicial,* 99 ALR2d 1249.

A few of the questions referring to Chaldeans may have been relevant but most were not. Arguably, the questions directed to the insurance broker about the amount of business he derived from Chaldeans related to his credibility by revealing bias or interest. *People v Field,* 290 Mich 173, 178; 287 NW 422 (1939), *People v Meier,* 47 Mich App 179, 196; 209 NW2d 311 (1973). But that cannot justify asking the witness what a Chaldean is or whether the previous owners of the True Value Supermarket were Chaldeans. There was likewise no justification for asking Edward George whether his new wholesale business sold mainly to Chaldean markets. But above all, the lengthy cross-examination of Harry George accentuated his national origins in an entirely unnecessary way. Where the Chaldeans originated, the number of churches they attend, and the size and cohesiveness of the Detroit Chaldean community were questions irrelevant to any issue in the case.

Defendants argue that since Hazim Saeegh is a Chaldean, these questions served to rebut the plaintiffs' theory that the store was burned down by neighborhood blacks. But there was no admissible evidence that Saeegh was a Chaldean, and even if there was, the questions asked went far beyond the scope of the supposed rationale. Instead of pursuing a limited, focused inquiry, defense counsel indulged in unnecessary overkill. *Cf., People v Biondo,* 76 Mich App 155, 157; 256 NW2d 60 (1977). We conclude that for the most part the ethnic allusions were irrelevant.

However, due to the particular circumstances of this case, the questioning was not prejudicial. There was no objection to most of the questions concerning Chaldeans, and the objections to others rested on other grounds than their prejudicial

character. Failure to object specifically and for proper reasons to the admission of evidence precludes appellate review unless there is manifest injustice. *People v Frederick Lester,* 78 Mich App 21, 32; 259 NW2d 370 (1977). Additionally, there was no request for a curative instruction. Unless the remarks of counsel are so prejudicial as to be irreparable by a cautionary instruction, the failure to request such an instruction forecloses appellate review. *Hill v Husky Briquetting, Inc,* 78 Mich App 452; 260 NW2d 131 (1977), *Smith v E R Squibb & Sons, Inc,* 69 Mich App 375, 386; 245 NW2d 52 (1976). Finally, in this case, unlike *Cluett, Solomon,* and *Nemet, supra,* there was no resort to ethnic epithets or stereotypes or other blatant appeals to prejudice. This is not to say that facially neutral ethnic references cannot be prejudicial. But, taking everything into account, including the direct and circumstantial evidence supporting defendants' claim of arson, we hold that the questioning was not so prejudicial as to deny the plaintiffs a fair trial.[4]

Affirmed.

## APPENDIX

That part of the cross-examination of Harry George which focused on the Chaldean community rather than the issues in the case was conducted by counsel for defendant Travelers Indemnity Company and went as follows:

"Q. And, you are a Kaldean *[sic]*, is that correct?
"A. Yes.

---

[4] We emphasize that our holding does not imply that we condone the tactics in question. Counsel who indulge in such argument always bear the risk that unnecessary prejudice will, in the right case, overwhelm an otherwise proper presentation of relevant evidence. This Court will not hesitate to call their bluff. *See People v Hoye,* 80 Mich App 258; 263 NW2d 343 (1977).

"Q. What is a Kaldean?

"A. Huh?

"Q. What is a Kaldean?

"A. Well, that's an old—I get these mixed up. You have heard of Bubitania or something. I cannot pronounce it. We originated from there. Butibazania, I don't—

"Q. Well, is it—

"MR. KRANSON: *[plaintiff's counsel]:* If you want some help I will tell you. He is trying to say Mesopatamia *[sic],* and he is trying to tell you that they speak the Arabic language which is the same language that Jesus Christ spoke.

"THE WITNESS: Correct.

"MR. KRANSON: And they are all from the same community in Telkeef. I have represented them for twenty-five years. I will answer your questions if you would like me to.

"MR. TUFFLEY: *[counsel for Travelers]:* Thank you, Mr. Kranson.

"Q. (By Mr. Tuffley:) Now, is there a Kaldean community in the Detroit metropolitan area?

"A. Yes

\* \* \*

"Q. And, would it be fair to say that the Kaldean community in this Detroit area is a rather closeknit community?

"MR. KRANSON: Your Honor, the Kaldean community here has nothing to do with this trial. It is immaterial and irrelevant.

"THE COURT: Do you wish to respond, Mr. Tuffley?

"MR. TUFFLEY: Yes, Your Honor, I think it does because, as we have indicated to the Court and the jury that we intend to prove in this case that there was a—that the individual who was

hired to set this particular fire was in fact hired by a gentleman who was Kaldean, as opposed to the theory of the Plaintiff in this case, which I think is obvious.

"THE COURT: Well, even if that were true, does that mean that he hired this man. I am not sure I understand the connection.

"MR. TUFFLEY: Well, the connection was obviously, Your Honor, if there were only ten Kaldeans in the community, it would have a great deal of relevance. On the other hand, if there were a million Kaldeans in the Detroit area, there may not be.

"THE COURT: Why don't you ask him that question, how many Kaldeans are there in this area.

"Q. (By Mr. Tuffley:) Do you know how many Kaldeans there are in the metropolitan Detroit area?

* * *

"THE COURT: You say 10,000?

"THE WITNESS: Maybe that's not—I mean, how would I know? I am not—

"THE COURT: All right. Go ahead.

"Q. (By Mr. Tuffley:) This is a—the Kaldeans have their own phone book, haven't they?

"A. They do.

"Q. And that lists all the Kaldeans in the Detroit metropolitan area, and their address and their telephone number.

"A. Mostly all of them that are here.

"Q. And their businesses and so forth?

"A. Yes.

"Q. And, do you know how that came about, why that telephone book was put together?

"A. Well, the church did that.

"Q. The church?

"A. Yes.

"Q. Is there a particular church which is attended by Kaldeans?

"A. Two of them.

"Q. There are only two churches in the Detroit area?

"A. None in the Detroit area, no.

"Q. Well, where are they located?

"A. We have one in the Detroit area, I think, and one in Southfield.

"Q. There are two Kaldean churches then?

"A. Yes.

"Q. And they prepared this telephone book?

"A. I think so.

"Q. And that contains most of the names and addresses and so forth of the Kaldeans in the community?

"A. Right.

"Q. Would you say that you know, at least by name, the majority of the Kaldeans in the Detroit metropolitan area, Mr. George?

"A. Not all of them, no.

"Q. Quite a few?

"A. I know quite a few, yes.

"Q. You have probably sponsored a number of people who have immigrated to the United States, haven't you?

"A. What do you mean by sponsored?

"Q. Well, given them jobs and so forth and helped them get started when they get here.

"A. Whenever they come and ask for a job, whoever they be, I will give them a job. Not only the Kaldean people, whoever needs help, we give them help. It is not only the Kaldeans.

"Q. Not only Kaldeans?

"A. No, sir."