No. 56,441
No. 56,970

DAVID NEISES and MARLENE NEISES, husband and wife, and BOARD
OF COUNTY COMMISSIONERS for DICKINSON COUNTY, KANSAS, *Appellants*, v. THE SOLOMON STATE BANK, SOLOMON, KANSAS, A
Corporation, and TRINITY UNIVERSAL INSURANCE COMPANY OF
KANSAS, INC., *Appellees.*

(696 P.2d 372)

Opinion filed March 2, 1985.

*Doug Thompson*, of Bengtson, Waters & Thompson, Chartered, of Abilene, argued the cause, and *Richard F. Waters*, of the same firm, was with him on the briefs for appellants David and Marlene Neises.

*Hal D. Metzler,* of Turner & Boisseau, Chartered, of Wichita, argued the cause, and *Casey R. Law* and *Hannelore Kitts,* of the same firm, were with him on the briefs for the appellee Trinity Universal Insurance Company of Kansas, Inc.

The opinion of the court was delivered by

LOCKETT, J.: This is a consolidated appeal involving a bifurcated trial. The first action, for breach of contract to collect insurance benefits pursuant to a proof of loss claim filed with the appellee insurance company for a fire loss to the appellants' residence, was tried to a jury. The second part of the bifurcated action, concerning the failure of the insurer to reserve its rights before making an election for partial payment of insurance proceeds and for determination of whether the insurer's contract was void as against public policy, was tried before a second judge.

In 1978, the appellants, David and Marlene Neises, who were engaged in the construction/remodeling business at Solomon, Kansas, began building a Shane Modular Home to qualify as representatives for that company. To cover the costs as the work progressed, the Neises obtained construction loans from the Solomon State Bank (Bank). The Neises occupied the house as their family residence while constructing the home.

In late 1979, the construction/remodeling work in the Solomon area slowed considerably, and David Neises decided to relocate the family business in Wichita. The Neises purchased a residence there in the fall of 1980. The value of the Solomon house was appraised at $104,640.00. From the end of 1979 through the spring of 1981, though listed with various realtors at various prices, the Neises were unable to find a buyer for the house.

When the Neises were unable to pay their mortgage payments for the Solomon house, in March of 1981 the Bank requested that the property be listed for sale at $47,500.00. On May 18, 1981, the Bank instructed its attorney to foreclose on the real estate.

On June 24, 1981, the Neises conducted an auction of the residence. The mortgage holder, the Bank, was the highest bidder at the auction, bidding the amount due on their mortgage. Owing money on two mortgages, the Neises declined to sell to the Bank.

Following the unsuccessful auction, David Neises approached a friend, Charles Halton of Wichita, and persuaded Halton to enter into a sham sales contract for the purchase of the residence

in Solomon. On June 29, 1981, a sham contract was signed, and David Neises notified the Bank that a purchaser for the residence was willing to pay $58,500.00, and he had received a check for $5,000.00 as earnest money.

From the time construction of the home was commenced, the Neises had homeowners insurance coverage on their Solomon house in the amount of $80,000.00 with Kansas Fire and Casualty Insurance Company. When the house became vacant, it no longer qualified for coverage under a homeowner's policy.

An independent agent, at the request of Kansas Fire and Casualty, contacted Marlene Neises and advised her of the need to rewrite coverage. The Neises decided to cancel coverage with Kansas Fire and Casualty Insurance Company and obtain fire and extended coverage with the appellee, Trinity Universal Insurance Company of Kansas, Inc. (Trinity) for $80,000.00. The premium was paid by the Neises and accepted by Trinity and the policy issued.

By July 31, there had been no indication Mr. Halton was a qualified buyer, so on August 4, 1981, a foreclosure action was filed by the Bank. After meeting with their attorneys in late October, 1981, the Neises filed their answer out of time.

On August 9, 1981, between 3:00 and 4:00 a.m., the home in Solomon was wholly destroyed by fire. The fire had been deliberately set by placing tires in the structure at different locations on the lower and upper levels and pouring a flammable liquid over them.

On September 25, 1981, David Neises filed a proof of loss. Trinity denied payment claiming the insured had burned the home. Trinity did pay the Bank, under the binder issued, the amount of the outstanding mortgage. Legal actions were commenced by the Neises to collect the insurance proceeds.

During the jury trial, the judge admitted as evidence some, but not all, of the results of a psychological stress evaluation (PSE) prepared from an interview with David Neises. The interview was conducted by Ivan Saunders, an independent fire investigator employed by Trinity to investigate the fire.

The court found that certain PSE evidence was probative and material. In those instances where Trinity's counsel could corroborate by substantial evidence the results of the test, independent of the PSE test, the court allowed the PSE testimony to

be presented to the jury as evidence based upon a scientific technique.

The Neises argue that the admission of the results of the PSE evaluation were prejudicial and reversible error. Trinity disagrees.

Saunders testified at trial as to his experience as an examiner and his use of the PSE equipment. He had based his evaluation of David Neises on a taped interview. Neises was unaware that the interview was being tape recorded and would be evaluated. Trinity proffered the evaluation of the responses to 22 questions, but the court allowed only 11 responses for which there existed substantial independent evidence to be presented to the jury.

The PSE is basically a voice lie-detector test. The principle underlying the test is that the human voice has many frequencies or a number of sound waves. In addition to the voice that can be heard, there are a series of low frequency sound waves which are inaudible to the human ear. When a person is under stress or lying, these sound waves tend to disappear, due to physiological changes in the body.

In order to conduct the test, the subject is asked certain questions and the answers are recorded on a tape recorder. This tape is reduced in speed and is fed into a psychological stress evaluator, which is similar to an electrocardiogram machine. Based on the reading of the chart from this machine, the examiner determines whether the subject is lying or telling the truth.

The PSE does not detect deception per se. It records reactions to a given situation, most commonly a question and answer session. Those reactions may be charted, and the interpretation of those reactions may lead the examiner to conclude that an individual is lying. Lie detection relies on one basic principle: an individual undergoing stress will exhibit certain involuntary reactions caused by that stress. See Kenety, *The Psychological Stress Evaluator: The Theory, Validity and Legal Status of an Innovative "Lie Detector,"* 55 Ind. L. J. 349 (1980).

In Kenety's article, he noted that the PSE and the polygraph operate similarly. Both rely on the fact that deception causes stress and that stress causes psycho-physiological changes. While the polygraph measures changes in the subject's heartbeat, respiration and perspiration, the PSE measures changes in the subject's voice. While Kenety stated that the PSE has many

advantages over the polygraph, he said that the PSE has had far less scientific substantiation than the polygraph:

"There have been no controlled scientific field studies of the PSE conducted by a disinterested party. The results of laboratory simulations have been inconclusive and conflicting, and although field results and manufacturers' studies have indicated that the PSE may have considerable utility, as yet they have not been validated by independent research. These field tests hold out the hope that the PSE could be a valuable tool in the detection of deception and indicate that further study is warranted. As yet, however, the extent of its validity remains undetermined." 55 Ind. L. J. at 357.

This court considered the admissibility of new scientific evidence in *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981). In that case, we followed the test enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), stating:

"[B]efore a scientific opinion may be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. . . . [I]f a new scientific technique's validity has not been generally accepted or is only regarded as an experimental technique, then expert testimony based upon its results should not be admitted into evidence." 229 Kan. 53.

In *Washington,* this court refused to abolish the Frye test, stating that to do so would produce utter chaos and resulting injustice in criminal cases. The court in *Washington* ruled that the multi-system method of blood analysis of polymorphic enzymes was generally accepted as reliable in the scientific community and that expert testimony on that subject was admissible.

In *Tice v. Richardson,* 7 Kan. App. 2d 509, 644 P.2d 490 (1982), the Court of Appeals, using the *Frye* test, held that the human leucocyte antigen test is sufficiently established to have gained general acceptance in the particular scientific field to which it belongs as a reliable test to prove paternity.

Only one state has allowed admission of PSE results in court, while two states have refused to allow such evaluations. In *Simon Neustadt Fam. Ctr. v. Bludworth,* 97 N.M. 500, 641 P.2d 531 (Ct. App. 1982), the New Mexico court found that PSE evaluations did not substantially differ from polygraph tests, that polygraph tests were admissible in New Mexico, and that PSE evaluations should be admissible at the discretion of the trial court.

Two states have rejected the use of PSE evidence. In *Smith v.*

*State*, 31 Md. App. 106, 355 A.2d 527 (1976), the Maryland court said:

"The difference, if any, between the psychological stress evaluation test and a lie detector test is too minor and shadowy to justify a departure from our prior decision. A lie detector test by any other name is still a lie detector test." 31 Md. App. at 120.

Louisiana has also rejected use of PSE evidence in *State v. Schouest*, 351 So.2d 462 (La. 1977).

Kansas first considered whether to allow the admission of polygraph test results into evidence in *State v. Lowry*, 163 Kan. 622, 185 P.2d 147 (1947). The court, in finding such evidence inadmissible, said that to allow such evidence would impair the vital function of cross-examination. While the operator, appearing as a witness, might be questioned as to his qualifications, experience, his methods, and on similar matters, the machine itself could not be subjected to any type of examination.

While some studies have shown that polygraph tests have an 85 to 90 percent accuracy rate, there have been no such independent studies done to verify the results of PSE tests. The *Frye* test requires that a new scientific technique gain such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting such expert testimony.

Mr. Saunders, owner of Associate Research Consultants, testified not only as to the results of his investigation, but also attempted to lay the foundation for the admission into evidence of the results obtained by use of a new scientific technique, the PSE equipment.

Mr. Saunders advised the court and jury that he was a member of Kansas Association of Psychological Stress Evaluators and that such association consists of approximately fifty-eight (58) members who are trained in the use of psychological stress evaluators and furthermore, that a psychological stress evaluator is an instrument which is used to detect deception in statements and that its use is primarily investigative.

When asked to explain how an investigation utilizes the psychological stress evaluator, Mr. Saunders advised the jury:

"An investigator will use a psychological stress evaluator to verify statements made by victims and/or suspects in a crime.

"The way the psychological stress evaluator works, all human beings have a

conscience and everything that you do, see or hear is stored in your subconscious mind. When a person tells a deceitful answer to a question, there's a phenomena which occurs."

Mr. Saunders advised the court pursuant to appellee's proffer that the psychological stress evaluator was invented by two former Army officers, Col. McClouston and Col. Bell, and used by Army Intelligence in 1960 through 1965. Furthermore, that Col. McClouston and Col. Bell retired from military service and started the company of Dektor, which marketed and sold the machine to the public.

Upon voir dire by appellants' counsel, Mr. Saunders answered the following questions:

"MR. WATERS: . . . [T]his testimony — the Army — you say that the Army — the court of military justice has accepted this as evidence in court martials?
"A. No."

And again when questioned by appellants' counsel, Mr. Saunders stated:

"Q. (By Mr. Waters:) Well, I simply asked if you know whether or not it's been accepted by the court martials — by the court of military justice.
"A. I do not know if it's been used in court martials, no.
"Q. Can you give us the citation of the court of last resort of any case of any state where this machine has been accepted as being evidence of— of deception from a witness?
"A. Sir, I cannot do that without checking books. There has been some cases but I do not have 'em available for me to . . . .
"Q. You can say with certainty it has not been accepted by the Kansas Supreme Court?
"A. Not to my knowledge."

And later concerning the same line of questioning, Mr. Saunders stated in answer to the following questions:

"Q. . . . I asked you if there was not a physiological function involved.
"A. There's a phenomenon involved. I know — I am not — unsure if it's physiological —
"Q. Please define a phenomena.
"A. That's a — in my interpretation, not quoting from Webster or anything like that, but a phenomena is a thing that takes place which is unexplainable at that time — its an unknown happening.
"Q. Alright, so we have — we know we have a physiological function and psychological functions and you're adding one or you have one called a 'phenomenal function.' You're saying it — it's unknown.
"A. Right.

"Q. And who knows about it.
"A. I do not know.
"Q. Nobody knows about it.
"A. Its still a phenomena."

Mr. Saunders continued to answer questions from appellants' counsel as follows:

"Q. Have you heard an expert testify in court concerning the reliability of this instrument?
"A. No.

"Q. Most important, do you know if in that case some expert was able to tell the Court how the machine worked — how it worked physiologically or psychologically — physiologically or functionally — how it worked?
"A. To my knowledge, it was about in the same line that I explained the phenomena which occurred that causes the reaction that we read on the chart.
"Q. In other words as far as you know the only explanation that's ever been given to any court as to how this machine works is the explanation you've given today.
"A. To my knowledge.
"Q. And that is an 'unknown phenomena.'
"A. Right. I have not witnessed any actual testimony in any court other than myself.
"Q. An unknown — an unknown phenomena.
"A. Right.
"Q. And you believe the Court accepted that as evidence of reliability --
"A. Yes.
"Q. — that there's an unknown phenomena that causes it to be reliable.
"A. Yes sir."

There has been no evidence presented in this case to show that PSE tests have any standing in the scientific community. The court erred in allowing admission of the PSE results. The admission of the evidence of the PSE results did prejudice the substantial rights of the Neises and affords basis for reversal and a new trial.

The Neises also allege that Trinity's counsel violated the court's order in limine as to the questioning of Ivan Saunders concerning the results of the PSE. Upon a request for clarification by appellee's counsel as to whether the order excluded all further testimony by the witness regarding any other PSE responses, the court stated that he would rule on it on a question-by-question basis; i.e., "that the court will rule on objections and the evidence as it comes to the jury at this point." Having determined that the admission of the PSE results was improper,

any questions concerning the order in limine allowing testimony as to the PSE become moot.

The Neises contend that the court incorrectly instructed the jury that Trinity's burden of proof in a fraud case involving an insurance contract was "more probably true than not." They argue that the jury should have been instructed that while the burden was a preponderance, the evidence must be "clear and convincing." Trinity argues that the court presented the correct instruction to the jury since this is an action based upon a breach of the insurance contract, not fraud.

Kansas has not directly considered this issue. The Tenth Circuit held in a Kansas case, *Jamaica Time Petroleum, Inc. v. Federal Insurance Company*, 366 F.2d 156 (10th Cir. 1966), that the insurer must establish by a fair preponderance of the evidence the incendiary origin and responsibility of the insured therefor to sustain the defense of arson in an insured's action to recover under a fire policy. This is the rule followed in most jurisdictions. See *Mele v. All-Star Ins. Corp.*, 453 F. Supp. 1338 (E.D. Pa. 1978); *Ferguson v. Am. Family Mut. Ins. Co.*, 566 F. Supp. 1090 (E.D. Mo. 1983); *Joubert v. Travelers Indem. Co.*, 736 F.2d 191 (5th Cir. 1984); *George v. Travelers Indemnity Co.*, 81 Mich. App. 106, 265 N.W.2d 59 (1978); *Dean v. Insurance Co. of North America*, _____ Ind. App. _____ , 453 N.E.2d 1187 (1983); *Schultz v. Republic Ins. Co.*, 124 Ill. App. 3d 342, 464 N.E.2d 767 (1984); *Quast v. Prudential Property and Cas. Co.*, 267 N.W.2d 493 (Minn. 1978); *Bufkin v. Texas Farm Bureau Mut. Ins. Co.*, 658 S.W.2d 317 (Tex. Civ. App. 1983); *Godwin v. Farmers Ins. Co. of America*, 129 Ariz. 416, 631 P.2d 571 (Ct. App. 1981).

At least three jurisdictions, however, take a different view of the burden of proof. In *Carpenter v. Union Insurance Society of Canton, Ltd*, 284 F.2d 155 (4th Cir. 1960), the court said that if the fire was an incendiary fire for the purpose of collecting insurance, it was a fraudulent fire, and fraud must be proven by clear and convincing evidence. This is similar to the reasoning of the Virginia courts. See *Mize v. Harford Ins. Co.*, 567 F. Supp. 550 (W.D. Va. 1982). The New York courts also require clear and convincing evidence. *Hutt v. Lumbermens Mut. Cas. Co.*, 95 App. Div.2d 255, 466 N.Y.S.2d 28 (1983).

This is not a case of fraud on the insurance company by

misrepresentation on the proof of loss claim form. The insurance company's defense was one of arson, an entirely different type of defense. The company is not claiming that the insurance contract is void because, at the time it was obtained, the insureds had the intent to commit arson and collect under the policy. Rather it claims that the Neises committed an unlawful act, arson, or procured its commission, which is a simple breach of contract. Strong principles of public policy deny the insured the right to recover when he intentionally sets on fire property covered by the insurance contract. The insurer's evidence that the insured set or otherwise caused the fire need not be clear and convincing, exclude any reasonable doubt, preclude any other possibility, or be the only reasonable explanation for what occurred. Rather, the insurer's evidence need only be by a preponderance of the evidence or more probably true than not.

In the present case, there was no error in the trial court's application of the preponderance of the evidence standard. When an insured brings an action based upon insurance for losses suffered, and an insurer raises an affirmative defense such as arson to deny payment for the insurer's losses, the insurer must show by a preponderance of the evidence that the fire was of an incendiary origin and that the insured caused the fire.

The Neises' property suffered fire loss on August 9, 1981. The Neises' insurance policy with Trinity contained a standard mortgage clause which provided that any loss payable under the policy shall be payable to the mortgagee as his interest appears, even though the claim by the insured may be denied. On September 28, 1981, Trinity paid the Bank $39,565.61, which fully satisfied the outstanding mortgage obligation of the Neises to the Bank on the Neises' property in Solomon. On December 28, 1981, Trinity informed the appellants' counsel that it refused to pay on the appellants' claim. The Neises filed suit claiming Trinity had failed to reserve its rights before electing to pay the Bank and to determine whether the insurer's contract was void as against public policy. This portion of the bifurcated action was tried before a different judge than the one who presided at the jury trial. The trial judge denied the Neises' claims. The Neises appealed.

The Neises argue that by paying the mortgagee, the insurer treats the policy as a valid policy, and, therefore, cannot deny

payment to appellants. They claim that the insurer has made an election by making partial payment to the mortgagee, and, therefore, should be estopped from acting inconsistently with that election. Trinity argues that under the standard mortgage clause, Trinity was required by law to pay to the Bank the amount of the Bank's interest, but this in no way determined whether Trinity had to pay the appellants/insureds.

The Neises mistakenly base their argument on *Insurance Co. v. Marshall*, 48 Kan. 235, 29 Pac. 161 (1892). The facts in that case differ significantly from the present case. In that case, the plaintiff issued an insurance policy to one of the defendants upon a house and made the loss payable to the mortgagee. The mortgagee assigned the notes, mortgage and insurance policy to another, with the knowledge of the insurer. When the property was totally destroyed by fire, the insurer paid the assignee, and took an assignment of the notes, mortgage and policy to itself, and then denied there was a valid policy. The issue in that case was whether there was a valid insurance policy.

In *Insurance Co.*, this court agreed with the finding of the lower court "that the [fact that the] insurance company paid to the holder of its policy the amount named therein clearly established the fact that it recognized the policy as a valid and subsisting obligation." 48 Kan. at 237-38. In the present case, there was no question as to whether the insurance policy owned by the Neises was valid or in force. Trinity recognized the validity of the policy and, because there was a valid policy in force, paid the Bank under the standard mortgage clause. *Insurance Company* does not in any way stand for the principle that because the insurance company paid the mortgagee, it must also pay the insured under the policy.

The standard or union mortgage clause of an insurance contract has been analyzed by this court on several occasions. We have been consistent in holding that such a clause creates a new and independent contract which entitles the mortgagee to recover under the policy of insurance, notwithstanding the effect of any act or neglect on the part of the owner or mortgagor of the property. *Fancher v. Carson-Campbell, Inc.*, 216 Kan. 141, 144, 530 P.2d 1225 (1975).

The facts of *Prather v. National Fire Ins. Co.*, 153 Kan. 477, 112 P.2d 99 (1941), are similar to those of the present case. In

*Prather,* the defendant insurer had issued a fire insurance policy to plaintiffs. The house burned and the plaintiffs notified their insurance agent of the loss. The insurance company refused to pay the loss under the policy, but later settled with the heirs to the property who claimed to have legal title. The plaintiffs claimed the right to the insurance proceeds, since they were buying the property on a contract basis from the heirs. The plaintiffs made the same argument in the trial court as the appellants are making here, that since the defendant recognized the policy was valid by making the payment to the heirs, it could not claim it was void as to the plaintiff. They contended that the insurer waived the defense of fraud by the plaintiff when it made payment to the heirs. The court said:

"[T]hat the policy in this case provided that loss under the policy should be payable to the Beaver estate, mortgagee, as its interest might appear, and that the insurance as to the interest of the mortgagee should not be invalidated by any act of the mortgagor.

"This court has held that such a provision constituted a separate contract between insurer and the mortgagee and that the insurer was liable to the mortgagee as to its interest even though it might have a defense against liability on the policy as to the mortgagor. (See *Fuller v. Fire Insurance Co.,* 117 Kan. 282, 231 Pac. 53, also *Metropolitan Life Ins. Co. v. Mennonite Mutual Fire Ins. Co.,* 131 Kan. 628, 293 Pac. 402.) Since that is the rule, the insurer in this case did not waive any defenses it might have had as to its liability to the party who appeared as the mortgagor in the policy. (See 7 Couch on Insurance, 5577, also *Clark v. Casselman,* 177 Cal. 82, 169 Pac. 1005, also *Glaser v. Williamsburg, Etc., Ins. Co.,* 72 Ind. App. 319, 125 N.E. 787.)" 153 Kan. at 481.

Kansas follows the majority rule, *i.e.,* that a standard mortgage clause operates as a distinct and separate contract between the insurer and the mortgagee. Based on this contract, the insurer, Trinity, was required to pay the mortgagee, Solomon State Bank, despite any acts of the insured which may have affected the rights between the mortgagor and the insurance company. There was no clause in the insurance contract which required the insurer to reserve its rights before paying the mortgagee. The decision of the trial court in favor of the insurer is affirmed.

The Neises argue that the part of the standard mortgage clause which allows an insurer to pay a mortgagee pursuant to an insurance policy, while denying payment to its own insured, to receive an assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt, and then to

proceed against its own insured to foreclose such mortgage is a violation of public policy. Trinity argues that subrogation and assignment are specifically authorized by Kansas cases and are supported by public policy in that it helps keep insurance companies' costs down.

In *Bank v. Insurance Co.*, 104 Kan. 278, 178 Pac. 413 (1919), this court considered whether in an action on a fire insurance policy, the insurance company, upon satisfaction of a judgment against it in favor of a mortgagee under a mortgage clause of the policy, is entitled to subrogation to the claims of the mortgagee, where it has a valid defense as against the assured.

There the insurer was under no obligation to the insureds by virtue of the policy, but it had been compelled to pay their debt by virtue of the judgment in the bank's favor. Since neither of the insureds could acquire any right to the insurance because the policy was void as to them, the company, having paid their debt, was entitled to the rights the bank acquired under the mortgage. 104 Kan. at 281.

In *Metropolitan Life Ins. Co. v. Mennonite Mutual Fire Ins. Co.*, 131 Kan. 628, 293 Pac. 402 (1930), the court held that under the "union mortgage clause," where it appears that the insurance company is not liable to the mortgagor and owner to whom the policy was issued, but is liable to the mortgagee, the insurance company upon payment of the amount of its policy is entitled to be fully subrogated to the security held by the mortgagee to the extent of the amount paid by it in accordance with the subrogation clause set forth in the mortgage clause attached to its policy. The issue was also discussed in *Dervold v. Republic Mutual Fire Ins. Co.*, 142 Kan. 43, 45 P.2d 839, (1935), and in *Drewicki v. Fidelity & Guaranty Fire Corp.*, 162 Kan. 10, 174 P.2d 75 (1946).

Cases where subrogation and assignment have been allowed include: *Lovell v. Insurance Co.*, 302 N.C. 150, 274 S.E.2d 170 (1981); *Hawkeye-Security Insurance Co. v. Apodaca*, 524 P.2d 874 (Wyo. 1974); *Phalen Park State Bank v. Reeves*, 312 Minn. 194, 251 N.W.2d 135 (1977); and *State Farm F. & Cas. v. Brethren Mut.*, 39 Md. App. 570, 386 A.2d 1249 (1978).

Subrogation is the right of one who has paid an obligation which another should have paid to be indemnified by the other. Black's Law Dictionary 1279 (5th ed. 1979). In the present situation, the insurer has paid the mortgagors' debt. The bank

has received full payment and to allow it to keep the property and collect on it again would allow the Bank to be unjustly enriched. To allow the property to return to the insureds debt-free would unjustly enrich them.

It is against public policy for an insured who burns his property to collect insurance on the property. By having the property returned to him after the insurer has discharged the debt for which the insured was personally liable would certainly unjustly benefit the insured. The only choice then is to assign the property to the insurer so that it may be indemnified, at least to some extent, for its loss due to the acts of the insured.

Case No. 56,441 is reversed and remanded for a new trial. Case No. 56,970 is affirmed.